**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| TABBATHA BENSON, SCOTT FRIEDSON, MICHAEL BROOKS, JOE SOLO, and BRITTANY CHUNG, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NVIDIA CORPORATION; ATI TECHNOLOGIES, INC., and ADVANCED MICRO DEVICES, INC., | ) ) ) ) |
| Defendants. | ) ) ) ) ) |

Case No.  2:07-cv-50
Judge Greer

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Tabbatha Benson, Scott Friedson, Michael Brooks, Joe Solo, and Brittany Chung, by their attorneys, bring this civil action for damages and injunctive relief on behalf of themselves and all other similarly situated in Tennessee, Arizona, California, and Nebraska (the "Class Jurisdictions") against the above-named Defendants[1] and demanding a trial by jury complain and allege as follows:

## JURISDICTION AND VENUE

1.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, to recover damages under state antitrust and consumer protection laws, and to recover the costs of suit,

---

[1]     "Defendants" mean each of the above-captioned Defendants who, individually, and collectively through their combination and conspiracy, perpetrated the wrongful conduct complained of herein.

including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendants' violations of those laws.

2. The Court has jurisdiction over the federal claim under 28 U.S.C. §§1331 and 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy. The Court also has jurisdiction over the state law claims under 28 U.S.C §1332 because the amount of the controversy for the Class exceeds $5,000,000, and class members are citizens of a different state than the Defendants.

3. Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C.§1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

4. The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect and impact on the foreign and interstate commerce of the U.S. and on trade and commerce within the States of Tennessee, Arizona, California, and Nebraska.

## DEFINITIONS

5. "Graphics Processing Units and Cards" are highly specialized semiconductors and related products that increase the speed, complexity and visual fidelity of digital images that can be displayed on graphical interfaces.

6. "Class Period" means November 30, 2002 through present.

2

## **THE PARTIES**

7. Plaintiff Tabbatha Benson, a resident of Tennessee, indirectly purchased Graphics Processing Units and Cards from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

8. Plaintiff Scott Friedson, a resident of Arizona, indirectly purchased Graphics Processing Units and Cards from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

9. Plaintiff Michael Brooks, a resident of California, indirectly purchased Graphics Processing Units and Cards from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

10. Plaintiff Joe Solo, a resident of California, indirectly purchased Graphics Processing Units and Cards from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

11. Plaintiff Brittany Chung, a resident of Nebraska, indirectly purchased Graphics Processing Units and Cards from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

12. Defendant Nvidia Corporation ("Nvidia") is a Delaware corporation, with its principal place of business at 2701 San Tomas Expressway, Santa Clara, California 95050. During the Class Period, Defendant Nvidia manufactured, sold and distributed Graphics Processing Units and Cards to customers throughout the U.S., including Tennessee, Arizona, California, and Nebraska.

13. Defendant ATI Technologies, Inc. ("ATI") is a Canadian corporation with its principal place of business at 1 Commerce Valley Drive East, Markham, Ontario, Canada L3T

3

7X6.    During Class Period, Defendant ATI manufactured, sold and distributed Graphics
Processing Units and Cards to customers throughout the U.S., including Tennessee, Arizona,
California, and Nebraska.

14.    Defendant Advanced Micro Devices, Inc. ("AMD") is a Delaware Corporation
with its principal place of business at One AMD Place, P. O. Box 3453, Sunnyvale, California
94088-3453. On July 24, 2006, AMD and ATI announced a plan to merge in a deal valued at
$5.4 billion. The merger closed October 25, 2006. The acquisition consideration included over
$2 billion financed from a loan, as well as 56 million shares of AMD stock. During the Class
Period, through AMD's acquisition of ATI, AMD manufactured, sold and distributed Graphics
Processing Units and Cards to customers throughout the U.S., including Tennessee, Arizona,
California, and Nebraska.

15.    Various others, presently unknown to Plaintiffs, participated as co-conspirators
with the Defendants in the violations of law alleged and have engaged in conduct and made
statements to further and advance these violations.

## FACTUAL ALLEGATIONS

### A.    The Graphics Processing Units and Cards Industry

16.    Throughout the Class Period, Defendants and their co-conspirators marketed and
sold Graphics Processing Units and Cards throughout the U.S., including Tennessee, Arizona,
California, and Nebraska.

17.    Nvidia Corporation states on its website that it is the "worldwide leader in
programmable      graphics      processor      technologies."      (<http://phx.corporate-
ir.net/phoenix.zhtml?c=116466&p=irol-homeprofile>). It further states that it creates products
for computing, consumer electronics, and mobile device applications. In its most recent Form

4

10Q, filed with the U.S. Securities and Exchange Commission on November 29, 2006, Nvidia stated that it has four major product-line operating segments: The graphics processing unit, or GPU Business; the media and communications processor, or MCP Business; the Handheld GPU Business, and the Consumer Electronics Business.

18.    Nvidia further states that its GPU Business is composed of products that support desktop personal computers or PCs, notebook PCs and professional workstations. Its MCP Business is composed of NVIDIA nForce products that operate as a single-chip or chipset that can off-load system functions, such as audio processing and network communications, and perform these operations independently from the host central processing unit or CPU. Nvidia's Handheld GPU Business is composed of products that support handheld personal digital assistants, cellular phones and other handheld devices. Nvidia's Consumer Electronics Business concentrates in products that support video game consoles and other digital consumer electronics including Sony's PlayStation 3 and Microsoft's Xbox360 videogame consoles.

19.    The Nvidia GPU and MCP brands include Nvidia GeForce, Nvidia GoForce, Nvidia Quadro, and Nvidia nForce. Nvidia's product applications include video games, film production, broadcasting, industrial design, space exploration, and medical imaging. Nvidia further states that, "[t]he world's leading PC and Handset OEMs incorporate Nvidia technology into their products, including Apple, Dell, Fujitsu Siemens, Gateway, HP, IBM, Lenovo, LG, Medion, Mitsubishi, Motorola, MPC, NEC, Samsung, Sony Electronics, Sony Ericsson, and Toshiba." Nvidia further states that it "partners with a broad range of system builders, such as Alienware, Falcon Northwest, HCL, SAHARA and Shuttle, to deliver solutions at every price point." Additionally, Nvidia products have been adopted by the world's leading add-in card and

motherboard manufacturers, including ASUS, BFG, EVGA, Foxconn, GIGABYTE, MSI, Palit, Point of View, and XFX.

20.    Defendant ATI stated in its 2005 Annual Report that it is one of the world's leading providers of graphics processors and technologies. It further stated that its "graphics processing units (GPUs) are highly specialized semiconductors that increase the speed, complexity and visual fidelity of digital images that can be displayed on graphical interfaces." ATI further stated that its products are found in desktop and notebook computers, and consumer electronics devices such as mobile phones, digital televisions and game consoles.

21.    ATI's two primary markets for its semiconductor graphics products are the PC and consumer markets, and in the first quarter of 2005 it began to report its financial results in two segments - PC and consumer. Its PC segment includes all 3D graphics, video and multimedia products, and chipsets developed for use in desktop and notebook computers, including professional workstations, servers and home media PCs. Its consumer segment includes products used in mobile phones, PDAs, DTVs and consumer electronics. In the PC segment, ATI's desktop GPU primary brands include Radeon (desktop products), FireGL (workstations) and All-in-Wonder (multimedia products). Its brand for notebook computer discrete products is Mobility Radeon. ATI's chipset products are targeted to motherboard manufacturers and OEMs, and include the Radeon Xpress 200 integrated chipsets for the desktop and notebook markets and the Radeon Xpress CrossFire Edition chipsets designed to be used in conjunction with one or more discrete graphics chips in graphically demanding applications such as gaming.

22.    In its consumer segment, ATI's products are designed to provide advanced visual and audio processing for color mobile phones and other handheld devices, and include ATI's

6

Imageon product line. With respect to digital television, ATI's Xilleon and Theater products are highly integrated visual and signal processing solutions offered to DTV and set-top box manufacturers. In the game console market, the Microsoft Xbox 360 and Nintendo GameCube both utilize ATI's products.

23.     ATI sells its products through various channels and to customers including OEMs; system integrators who build ATI's products into their PCs; original-design manufacturers who add ATI's products to their PC motherboard products or graphic-board products; and traditional and online distributors and retailers.

24.     The market for the manufacture and sale of Graphics Processing Units and Cards is conductive to the type of collusive activity alleged, as the market is oligopolistic in nature.

25.     The market for the manufacture and sale of Graphics Processing Units and Cards is subject to high manufacturing and technological barriers to entry. Efficient fabrication plants are large and costly. Graphics Processing Units and Cards are also subject to technological advances, so that firms within the industry must undertake significant research and development expenses.

26.     The Graphics Processing Units and Cards' industry has also been subject to significant consolidation during the Class Period.

27.     Defendants sell their Graphics Processing Units and Cards through various channels, including to manufacturers of electronic products and devices, and to Graphics Processing Units and Cards resellers. These electronic products and devices and Graphics Processing Units and Cards are then sold, directly or indirectly, to consumers and are not altered during the course of sale.

7

**B.     Defendants' Illegal Conduct**

28.     On November 30, 2006, AMD announced that it had "received a subpoena from the U.S. Department of Justice ("DOJ") Antitrust Division in connection with the DOJ's investigation into potential antitrust violations related to graphics processors and cards." (http://www.amd.com/us-en/Corporate/VirtualPressRoom/0,,51_104_543~114493,00.html>). AMD further stated that "AMD entered the graphics processor business following the company's acquisition of ATI Technologies, Inc. last month (October 25, 2006)." *Id.*

29.     On November 30, 2006, Nvidia announced that it had "received a subpoena from the San Francisco Office of the Antitrust Division of the Department of Justice in connection with the DOJ's investigation into potential antitrust violations related to Graphics Processing Units and Cards." (<http://phx.corporate-ir.net/phoenix.zhtml?c=116466&p=irol-news Article&ID=937753&highlight=>). A report in the December 1, 2006 *San Jose Mercury News* explained that "Department of Justice investigators asked Nvidia for pricing documents, customer agreements and other documents, company spokesman Michael Hara said Friday. 'They have asked for a pretty big data dump that goes back to the late '90s," Hara said. "It's a fairly broad request.' " (<http://www.mercurynews.com/mld/mercurynews/business /technology/16143619.htm>)

30.     A December 2, 2006 *San Francisco Chronicle* article expanded on Mr. Hara's remarks: "Michael Hara, vice president of corporate communications at Nvidia, said the Justice Department requested documents going back eight or nine years. 'It's a broad range of documents relating to customers, competitors, product stack, prices, market studies – everything, pretty much,' he said." (<http://www.sfgate.com/cgi-bin/article.cgi?file=/chronicle/ archive/2006/12/02/BUGTFMNRS81.DTL&type=business>)

8

31.    New reports also stated that "Gina Talamona, a spokeswoman for the DOJ, said the agency is looking into possible anticompetitive practices within the 'graphics processing unit and cards' industry." (<http://news.com.com/Justice+Dept+subpoenas+AMD%2C+Nvidia/2100-1006.3-6140041.html?tag=stdh>)

32.    Moreover, regular users of Nvidia and ATI graphics cards have voiced suspicions of   price-fixing   collusion   between   the   two   companies   in   recent   years. (<http://episteme.arstechnica.com/eve/forums/a/tpc/f/174096756/m/340003858631/inc/-1>).

One commentator has compared the DOJ's investigation of Graphics Processing Units and Cards to its successful prosecution of manufacturers of Dynamic Random Access Memory, which has resulted in $731 million in criminal fines: " 'If the DOJ wanted to, it could just go down every line in the semiconductor industry and find the same issue,' said Gartner Inc. analyst Richard Gordon. That's because there are a relatively few number of suppliers in the chip industry and an open flow of communication between competitors and customers, who may not define price fixing   the   say   way   the   DOJ   does,   he   said." (<http://www.computerworld.com/action/article/do?commmand=viewArticleBasic&taxonomyN ame=government&articleID=9005596&taxonomyID=13&intsrc=kc_top>).

33.    Similarly, in the previously cited San Francisco Chronicle article, "Crawford Del Prete of International Data Corp. said the investigation is not surprising. 'I am not surprised that (the Justice Department) is looking into this as there are few suppliers left, which aggregates pricing power,' he said in an e-mail."

34.    Other news reports contained similar comments by analysts. According to the *San Jose Mercury News* article quoted above, "'I have to believe this stuff traces back into history,' said Doug Freeman, an analyst with American Technology Research. 'As a consumer, I

9

have noticed that the price points of video cards have always been pretty equal. The first mover comes out with a product that is $500 and the follower comes out with a product that is $500. They tend not be in price wars.' Ashok Kumar, an analyst with Raymond James, said the Justice Department was possibly alerted by customers, such as PC makers or the so-called white-box clone PC makers based in Taiwan who try to keep their prices as low as possible. 'The question is, do prices fall with the normal trajectory of the costs?' Kumar said."

## FRAUDULENT, ACTIVE SELF-CONCEALMENT

35.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs. Defendants and their co-conspirators conducted their conspiracy, which by its nature is self-concealing, in secret and kept it within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants and their co-conspirators concealed the true nature of their unlawful conduct and acts in furtherance of it, and actively concealed their activities through various other means and methods to avoid detection. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before commencing this litigation.

36.    As a result of Defendants and their co-conspirators' active concealment, any and all applicable statutes of limitations otherwise applicable to Plaintiffs 'allegations have been tolled.

## CLASS-ACTION ALLEGATIONS

37.    Plaintiffs bring this class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class members:

10

**All-Plaintiffs Injunctive-Relief Class (alleged by all Plaintiffs)**
All persons and business entities in all 50 states that indirectly purchased products containing Graphics Processing Units and Cards manufactured, sold, or distributed by Defendants for end use and not for resale, from November 30, 2002 to present.

Excluded from the Injunctive-Relief Class are Defendants; entities in which Defendants have a controlling interest; Defendants' employees, officers, or directors; Defendants' legal representatives, successors, or assigns; judicial officers who may hear the case or related persons; and jurors or related persons.

38. Plaintiffs also bring this class action pursuant to Rule 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of themselves and the following multi-state class:

**All-Plaintiffs Money-Damages Class (alleged by all Plaintiffs)**
All people and business entities in Tennessee, Arizona, California, and Nebraska that indirectly purchased products containing Graphics Processing Units and Cards manufactured, sold, or distributed by Defendants, for end use and not for resale, from November 30, 2002 to present.

Excluded from the Money-Damages Class are Defendants; entities in which Defendants have a controlling interest; Defendants' employees, officers, or directors; Defendants' legal representatives, successors, or assigns; judicial officers who may hear the case or related persons; and jurors or related persons.

39. Plaintiffs also bring this class action pursuant to Rule 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of themselves and the following respective, individual state

classes:

**Arizona Class (alleged by Plaintiff Friedson)**
All people and business entities in Arizona that indirectly purchased Graphic Processing Units and Cards manufactured, sold, or distributed by Defendants, other than for resale, from November 30, 2002 to present.

11

**California Class (alleged by Plaintiffs Brooks and Solo)**

All people and business entities in California that indirectly purchased Graphic Processing Units and Cards manufactured, sold, or distributed by Defendants, other than for resale, from November 30, 2002 to present.

**Nebraska Class (alleged by Plaintiff Chung)**

All people and business entities in Nebraska that indirectly purchased Graphic Processing Units and Cards manufactured, sold, or distributed by Defendants, other than for resale, from November 30, 2002 to present.

**Tennessee Class (alleged by Plaintiff Benson)**

All people and business entities in Tennessee that indirectly purchased Graphic Processing Units and Cards manufactured, sold, or distributed by Defendants, other than for resale, from November 30, 2002 to present.

Excluded from the Arizona, California, Nebraska, and Tennessee classes are Defendants; entities in which Defendants have a controlling interest; Defendants' employees, officers, or directors; Defendants' legal representatives, successors, or assigns; judicial officers who may hear the case or related persons; and jurors or related persons.

40.    With respect to the All-Plaintiffs Class and the Tennessee, Arizona, California, and Nebraska classes, respectively, Plaintiffs have met the requirements of Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

41.    Plaintiffs do not know the exact size of the classes, since this information is in Defendants' exclusive control. But based on the nature of the trade and commerce involved, Plaintiffs believe that each class numbers at least in the hundreds and that the members of each class are geographically dispersed throughout the Class Jurisdictions. Therefore, joinder of the members of each class would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

42.     Plaintiffs' claims within the respective classes are typical of other class members'

claims because all class members were injured through the uniform misconduct described and

paid supra-competitive prices for products containing Graphics Processing Units and Cards

without being informed that they were paying illegal and improper prices. Accordingly, by

proving their own claims, Plaintiffs will presumptively prove the respective class members'

claims.

43.     Common legal and factual questions among and within the respective classes

exist, such as:

> a.     Whether Defendants conspired to fix, raise, maintain, or stabilize the
>        prices of Graphics Processing Units and Cards marketed, distributed, and
>        sold in the U.S., including Tennessee, Arizona, California, and Nebraska,
>        respectively;
>
> b.     Whether Defendants conspired to manipulate and allocate the market for
>        Graphics Processing Units and Cards marketed, distributed, and sold in the
>        U.S., including Tennessee, Arizona, California, and Nebraska,
>        respectively;
>
> c.     The existence and duration of Defendants' horizontal agreements to fix,
>        raise, maintain, or stabilize the prices of Graphics Processing Units and
>        Cards marketed, distributed, and sold in the U.S., including Tennessee,
>        Arizona, California, and Nebraska, respectively;
>
> d.     The existence and duration of Defendants' horizontal agreements to
>        manipulate and allocate the market for Graphics Processing Units and
>        Cards marketed, distributed, and sold in the U.S., including Tennessee,
>        Arizona, California, and Nebraska, respectively;
>
> e.     Whether each Defendant was a member of, or participated in, the
>        arrangement, contract, or agreement to fix, raise, maintain, or stabilize the
>        prices of Graphics Processing Units and Cards marketed, distributed, and
>        sold in the U.S., including Tennessee, Arizona, California, and Nebraska,
>        respectively;
>
> f.     Whether each Defendant was a member of, or participated in, the
>        arrangement, contract, or agreement to allocate the market for Graphics

13

Processing Units and Cards marketed, distributed, and sold in the U.S., including Tennessee, Arizona, California, and Nebraska, respectively;

g.    Whether Defendants' conspiracy was implemented;

h.    Whether Defendants took steps to conceal their conspiracy from Plaintiffs and the members of each class;

i.    Whether Defendants' conduct caused injury in fact to the business or property of Plaintiffs and the respective class members, and if so, the appropriate class-wide measure of damages;

j.    Whether the agents, officers or employees of Defendants and their co-conspirators participated in telephone calls, meetings, and other communications in furtherance of their conspiracy; and

k.    Whether the purpose and effect of the acts and omissions alleged was to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including Tennessee, Arizona, California, and Nebraska, and to manipulate and allocate the market for Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including Tennessee, Arizona, California, and Nebraska, respectively.

44.    Plaintiffs can and will fairly and adequately represent and protect the respective class members' interests and have no interests that conflict with or are antagonistic to the class members' interests. Plaintiffs' attorneys are experienced and competent in complex class action and consumer-antitrust litigation.

45.    Class certification of the respective, alternative classes is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

a.    Common questions of law and fact overwhelmingly predominate over any individual questions that may arise among or within the respective classes and, consequently, enormous economies to the court and parties exist in litigating the common issues, for each class, on a class-wide basis instead of on a repetitive individual basis;

14

b. Each individual class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

c. Class treatment is required for optimal deterrence against, and compensation for, Defendants' wrongful conduct alleged herein; and

d. Despite the relatively small size of each individual class member's claim, the aggregate volume of their claims, whether considered in one class or, alternatively, in Tennessee, Arizona, California, and Nebraska classes, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to each class.

46.    Plaintiffs' claims within and among the respective classes are typical of the associated class members' claims because Defendants injured Plaintiffs and the respective class members in the same manner (i.e., Plaintiffs and the respective class members were forced to pay supra-competitive prices for products containing Defendants' Graphics Producing Units and Cards).

47.    Class certification is appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecution of separate actions would create a risk of adjudication with respect to individual members of the respective classes, which may, as a practical matter, dispose of other class members' interests who aren't parties to the adjudication or which may substantially impair or impede individual class members' abilities to protect their interests. Separate actions prosecuted by individual class members would also create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

15

48.     Class certification, whether as an All-Plaintiffs class or multiple classes on behalf

of class members in Tennessee, Arizona, California, and Nebraska, respectively is appropriate

under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted on

grounds generally applicable to the respective class members.

## TRADE AND COMMERCE

49.     Throughout the Class Period, Defendants and their co-conspirators engaged in the

business of marketing and selling Graphics Processing Units and Cards throughout the U.S.,

including in Tennessee, Arizona, California, and Nebraska, respectively. During each year of the

Class Period, Defendants sold billions of dollars of Graphics Processing Units and Cards.

50.     The oligopolistic Graphics Processing Units and Cards market is conducive to the

conspiracy alleged here. The Graphics Processing Units and Cards market is subject to high

entry barriers. Efficient product fabrication plants are large and expensive. Graphics Processing

Units and Cards are also subject to technological advances, so firms within the industry must

undertake significant research and development expenses.

51.     During the Class Period, Graphics Processing Units and Cards prices rose, due in

significant part to the effects of the collusion currently under DOJ investigation.

52.     Electronic device manufacturers and Graphics Processing Units and Cards

resellers purchase Graphics Processing Units and Cards directly or indirectly from Defendants

and sell Graphics Processing Units and Cards-containing products to consumers, including

Plaintiffs and all class members.

16

## CLAIMS

### COUNT 1
**(Applicable to the All-Plaintiffs Injunctive-Relief Class)**
**VIOLATION OF THE CLAYTON ACT**

53.    Plaintiffs repeat and re-allege the foregoing paragraphs.

54.    During the Class Period, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize graphics processing units and card prices in the U.S., including in Tennessee, Arizona, California, and Nebraska, respectively, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

55.    In formulating and carrying out their illegal agreement, understanding, and conspiracy, Defendants did the following things, among others:

      a.    Fixed, raised, maintained, and stabilized Graphics Processing Units and Cards prices;

      b.    Allocated Graphics Processing Units and Cards markets among themselves;

      c.    Rigged bids for the award and performance of Graphics Processing Units and Cards contracts; and

      d.    Allocated Graphics Processing Units and Cards production

56.    Defendants' combination and conspiracy had the following effects, among others:

      a.    Price competition in the sale of Graphics Processing Units and Cards was restrained, suppressed, and/or eliminated in the U.S., including in Tennessee, Arizona, California, and Nebraska, respectively;

      b.    Prices for Graphics Processing Units and Cards sold by Defendants were fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S., including in Tennessee, Arizona, California, and Nebraska, respectively; and

17

c.    People and entities who purchased Graphics Processing Units and Cards directly or indirectly from Defendants have been deprived of the benefits of free and open competition.

57.    Graphics Processing Units and cards are necessary to make electronic products work - products which are now used, and which will at all relevant times in the foreseeable future continue to be used, by Plaintiffs and members of the Injunctive-Relief class. Plaintiffs and the Injunctive-Relief class members have been injured and will continue to be injured in their business and property by having paid more, and/or by continuing to paying more, for Graphics Processing Units and Cards purchased indirectly from one or more of the Defendants than they would have paid absent Defendants' conspiracy, including paying more for Graphics Processing Units and Cards-containing products.

58.    As a proximate cause of Defendants' conspiracy, Plaintiffs are entitled to an injunction against Defendants preventing and restraining Defendants' violations.

## COUNT II
## (Applicable to all Plaintiffs and the All-Plaintiffs Money-Damages Class)
## VIOLATION OF TENNESSEE LAW

59.    Plaintiffs repeat and re-allege the foregoing paragraphs.

60.    Tennessee law permits any person injured indirectly, like the Plaintiffs and class members, to seek redress for their injuries arising out of illegal conspiracies. Specifically, the TTPA provides that:

> Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.[2]

---

[2] T.C.A. §47-25-106 (2005).

18

61. In *Freeman Indus., LLC v. Eastman Chemical Co.*,[3] the Tennessee Supreme Court ruled that the TTPA was triggered not by anti-competitive conduct but by "the effect of the anti-competitive conduct." The Supreme Court also held that the TTPA's applicability, whether invoked by Tennessee residents *or* non-residents, should be judged by "whether the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree."

62. During the Class Period, Defendants illegal conduct substantially affected Tennessee commerce and caused injury to consumers in Tennessee.

63. Due to Defendants' price-fixing and market-allocation activities, Graphics Processing Units and Cards' prices increased illegally in Tennessee despite fluctuations in the cost of production. During the Class Period, Graphics Processing Units and Cards' prices didn't follow the laws of supply and demand existing in competitive markets, including markets in Tennessee.

64. Defendants' arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, or sold in Tennessee and to manipulate and allocate the market for Graphics Processing Units and Cards marketed, distributed, or sold in Tennessee had the following substantial effects on Tennessee commerce:

   a.   The prices of Graphics Processing Units and Cards indirectly purchased by Tennesseans were fixed, raised, maintained, and stabilized at inflated, artificial and non-competitive levels;

   b.   Tennesseans lost profits and were deprived of free and open competition in the purchase of Graphics Processing Units and Cards;

   c.   Competition in the sale of Graphics Processing Units and Cards was restrained in Tennessee; and

---

[3] No. E2003-00527-SC-S09-CV, 2005 Tenn. LEXIS 668 (Aug. 25, 2005).

d.    Tennesseans paid higher prices for products containing Graphics Processing Units and Cards than they would have paid absent Defendants' conspiracy.

65.    During the Class Period, Tennesseans indirectly purchased millions of dollars of Defendants' Graphics Processing Units and Cards in Tennessee from Defendants. By reason of Defendants' violations of the TTPA, Plaintiffs and the class members paid significantly more for products containing Graphics Processing Units and Cards than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiffs and the class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

66.    Defendants' conspiracy further substantially affected Tennessee commerce because Defendants, either directly or through their agents, engaged in the following activities in or affecting Tennessee:

a.    Transacted Graphics Processing Units and Cards' business in Tennessee;

b.    Contracted to supply or obtain goods or revenue related to their Graphics Processing Units and Cards' business in Tennessee;

c.    Intentionally availed themselves of the benefits of doing Graphics Processing Units and Cards' business in Tennessee;

d.    Produced, promoted, sold, marketed, and/or distributed Graphics Processing Units and Cards in Tennessee, thereby purposefully profiting from access to Tennessee's direct-purchaser and indirect-purchaser Graphics Processing Units and Cards' markets;

e.    Caused tortious damage in Tennessee by fixing Graphics Processing Units and Cards' prices;

20

f. Caused tortious damage in Tennessee by acts or omissions committed outside Tennessee by regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct within Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee;

g. Committed acts and omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

67. During the Class Period, Defendants' conspiracy substantially affected Tennessee commerce in the following additional ways:

a. The Conspiracy's Substantial Effect on Tennesseans' Trade or Commerce: Some price-fixing conspiracies only affect the commerce of a limited geographic region or a limited number of Tennessee residents. Defendants' conspiracy, however, was more far reaching – it substantially affected every person in Tennessee. Because Graphics Processing Units and Cards are a component part of many common consumer items, Graphics Processing Units and Cards were purchased and consumed by practically every person in Tennessee, in all segments of society, and in all geographic regions. There could hardly be anti-competitive conduct with a more substantial effect on the commerce of Tennessee and Tennesseans than Defendants' illegal conduct alleged here.

b. The Substantial Monetary Effect on Tennessee Trade or Commerce: Defendants' Graphics Processing Units and Cards' conspiracy lasted for years and over that time Defendants sold billions of dollars of Graphics Processing Units and Cards in the U.S. With even a modest estimated overcharge during that time, Defendants–who hold virtually all of the Graphics Processing Units and Cards' market–illegally profited by tens of millions of dollars from their conspiracy. Since Graphics Processing Units and Cards are purchased in relationship

21

to a state's total population and Tennessee has 2% of the U.S. population, the conspiracy's adverse effect on Tennessee commerce was at least multiple millions of dollars. Furthermore, the substantial monetary effect on Tennessee is more than to just consumers/indirect purchasers due to lost sales to Tennessee direct purchasers because of Defendants' illegal prices.

        c.      Substantially Harmful Effect on the Integrity of the Tennessee Market: The Tennessee market is vulnerable and can be manipulated by conspirators either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, as expressed by the Tennessee Supreme Court, companies that break the law will remain unpunished, and they will remain able to prey upon Tennesseans without consequence. The Tennessee Supreme Court explained that "the purpose of the TTPA is to protect the state's trade and commerce affected by anticompetitive conduct."[4] Defendants have shattered this very purpose by illegally and criminally victimizing the Tennessee market. Thus, every level of the Tennessee market's integrity has been compromised–from the manufacturer to the middlemen to the consumer.

        d.      The Substantially Adverse Effect on Tennessee Commerce Was Critical to the Criminal Conspiracy's Success: Because Graphics Processing Units and Cards are sold throughout the U.S., price arbitrage between states would prevent this conspiracy's effectiveness if it didn't affect every state, including Tennessee. Direct purchasers would buy cheaper Graphics Processing Units and Cards in Tennessee and then ship them to unaffected states. Thus, to ensure their conspiracy's effectiveness, Defendants knew that Tennessee commerce had to be, would be, and was substantially affected in order to carry it out.

---

[4] *Id.* at *23.

     e.     Length of Substantial Effect on Tennessee Commerce. Some conspiracies are short-lived. This one lasted for years, during which time Defendants profited from it, thereby permitting them to continue their victimization of Tennessee consumers and have a substantial effect on Tennessee commerce.

68.     During the Class Period, Defendants entered into arrangements, contracts, and agreements to fix prices of and allocate markets for Graphics Processing Units and Cards, which arrangements, contracts, and agreements lessened full and free competition in violation of the TTPA.

69.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

     a.     Met to discuss Graphics Processing Units and Cards' customers and markets;

     b.     Agreed to charge prices at certain levels and to increase or maintain prices for Graphics Processing Units and Cards sold in the U.S., including in Tennessee;

     c.     Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

     d.     Allocated Graphics Processing Units and Cards' markets and customers consistent with their illegal agreement.

70.     Defendants' conspiracy had the following substantial effects on Tennessee commerce:

     a.     Graphics Processing Units and Cards' price competition was restrained, suppressed, and eliminated in Tennessee;

     b.     Graphics Processing Units and Cards' prices were raised, fixed, maintained, and stabilized at artificially high levels in Tennessee;

     c.     Plaintiffs and class members who indirectly purchased Graphics Processing Units and Cards were deprived of free and open market competition, including in Tennessee, and were injured; and

23

d. Plaintiffs and class members paid more than they otherwise would have for Graphics Processing Units and Cards that they purchased indirectly, including Graphics Processing Units and Cards purchased in Tennessee.

71. Defendants' price-fixing and market-allocation conspiracy was perpetrated against and substantially affected Tennessee commerce by having victimized Tennesseans and/or by having occurred in Tennessee. The results of Defendants' actions occurring outside Tennessee also substantially affected Tennessee commerce by increasing the prices Tennesseans paid for products containing Defendants' price-fixed Graphics Processing Units and Cards. As the result of Defendants' illegal actions' substantial effect on Tennessee commerce, both direct and indirect Tennessee purchasers of Defendants' Graphics Processing Units and Cards have been injured.

72. As a direct and proximate result of Defendants' TTPA violations, all Plaintiffs and the All-Plaintiffs class members have suffered injuries and seek damages in an amount necessary to restore them to the position they would have been in had Defendants not violated the TTPA.

## COUNT III
### (Applicable to Plaintiff Friedson and the Arizona Class)
### VIOLATION OF ARIZONA LAW

73. Plaintiffs incorporate and re-allege the foregoing paragraphs.

74. During the Class Period, Defendants engaged in a flagrant contract, combination, or conspiracy in restraint of trade or commerce within Arizona. In particular, Defendants conspired to fix Graphics Processing Units and Cards' prices and allocate Graphics Processing Units and Cards' customers and markets. Defendants' conspiracy lessened full and free competition in Graphics Processing Units and Cards' importation and sale into Arizona and controlled their costs, which violated Ariz. Rev. Stat. §44-1401 *et seq.*

24

75.     Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Graphics Processing Units and Cards' prices; (b) allocate Graphics Processing Units and Cards' customers and markets; and (c) caused Plaintiff Friedson and the other Arizona class members to pay higher prices for Graphics Processing Units and Cards that they indirectly purchased from Defendants.

76.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

   a.     Met to discuss Graphics Processing Units and Cards' customers and markets;

   b.     Agreed to charge prices at certain levels and to increase or maintain prices for Graphics Processing Units and Cards sold in Arizona;

   c.     Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

   d.     Allocated Graphics Processing Units and Cards' markets and customers consistent with their illegal agreement.

77.     Defendants' conspiracy had the following effects:

   a.     Graphics Processing Units and Cards' price competition was restrained, suppressed, and eliminated throughout the U.S., including in Arizona;

   b.     Graphics Processing Units and Cards' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in Arizona;

   c.     Plaintiff Friedson and the other Arizona class members that indirectly purchased Graphics Processing Units and Cards were deprived of free and open market competition and were injured; and

   d.     Plaintiff Friedson and the other Arizona class members paid more than they otherwise would have for Graphics Processing Units and Cards that they purchased indirectly.

78.     Defendants' conspiracy substantially affected trade or commerce within Arizona.

79.     During the Class Period, Arizonans indirectly purchased millions of dollars of Defendants' Graphics Processing Units and Cards' in Arizona from Defendants. By reason of Defendants' violations of the Arizona Antitrust Act, Plaintiff Friedson and the Arizona class members paid significantly more for products containing Graphics Processing Units and Cards than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Friedson and the Arizona class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

**COUNT IV**
**(Applicable to Plaintiffs Brooks and Solo and the California Class)**
**VIOLATION OF CALIFORNIA LAW**

80.     Plaintiffs incorporate and re-allege the foregoing paragraphs.

81.     Beginning at a time unknown to Plaintiffs Brooks and Solo and the other California class members, but at least as early as November 30, 2002 to the present, Defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize Graphics Processing Units and Cards' prices and allocate Graphics Processing Units and Cards' customers and markets in California. Defendants' conspiracy lessened full and free competition in Graphics Processing Units and Cards' importation and sale into California and controlled their costs, in violation of §16720 *et seq.* of the California Business and Professions Code.

82.     Defendants and their co-conspirators communicated at meetings and in conversations to fix, raise, maintain and stabilize the prices of Graphics Processing Units and Cards, to allocate markets and customers, reached agreements to charge prices for Graphics Processing Units and Cards at certain levels, and otherwise to increase and maintain prices, and

26

issued price announcements and price quotations in California in accordance with their agreements.

83.    Defendants' and their co-conspirators' contract, combination, and conspiracy consisted of a continuing agreement, understanding, and concert of action between Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Graphics Processing Units and Cards sold in the U.S., including California, and to allocate markets and customers.

84.    For the purpose of formulating and effectuating the aforesaid contract, combination and conspiracy, Defendants and their co-conspirators did those things which they combined and conspired to do including, but not limited to, the acts, practices, and course of conduct set forth above, and the following, among others:

a.    Communicated with each other regarding prices to be charged for Graphics Processing Units and Cards;

b.    Agreed to charge prices at certain levels and otherwise to fix, raise, maintain and stabilize prices of Graphics Processing Units and Cards sold in the U.S., including California;

c.    Exchanged information on prices and sales volumes;

d.    Allocated markets and customers for Graphics Processing Units and Cards;

e.    Agreed on the reduction of production capacity;

f.    Monitored and implemented the arrangements among cartel members;

g.    Refrained from competing among themselves with respect to the sale of Graphics Processing Units and Cards; and

h.    Sold Graphics Processing Units and Cards at agreed-upon prices.

27

85.    Defendants' anti-competitive agreement was implemented by a series of coordinated price increase announcements that began in or about 2002. These coordinated price increases continued on a regular basis throughout the Class Period, with the actual and intended result that Plaintiffs Brooks and Solo and the other California class members paid supra-competitive prices for Graphics Processing Units and Cards for years.

86.    Similar price increases, in identical amounts and within close temporal proximity, were announced by the Defendants at various times throughout the Class Period.

87.    The activities described above were engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful arrangement to fix, raise, maintain, and stabilize the prices of Graphics Processing Units and Cards in California.

88.    The aforesaid combination and conspiracy had the following effects, among others:

   a.    Price competition in the sale of Graphics Processing Units and Cards by Defendants and their co-conspirators was restrained, suppressed and eliminated throughout the U.S., including in California;

   b.    Prices of Graphics Processing Units and Cards sold by Defendants and their co-conspirators were raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the U.S., including in California; and

   c.    Purchasers of Graphics Processing Units and Cards from Defendants and their co-conspirators, including Plaintiffs Brooks and Solo and the other California class members, were deprived of the benefit of free and open competition.

89.    During the Class Period, Plaintiffs Brooks and Solo and the other California class members indirectly purchased substantial quantities of Graphics Processing Units and Cards in California from Defendants. By reason of the violations alleged herein, Plaintiffs Brooks and Solo and the other California class members paid more for their purchases of Graphics Processing Units and Cards than they would have in the absence of Defendants' illegal contract,

combination, and conspiracy. As a result, Plaintiffs Brooks and Solo and the other California class members were injured and suffered damages in an amount presently undetermined.

## COUNT V
### (Applicable to Plaintiff Chung and the Nebraska Class)
### VIOLATION OF NEBRASKA LAW

90. Plaintiffs incorporate and re-allege the foregoing paragraphs.

91. During the Class Period, Defendants contracted, combined, and conspired in restraint of trade or commerce in Nebraska to fix Graphics Processing Units and Cards' prices and allocate Graphics Processing Units and Cards' customers and markets. Defendants' conspiracy lessened full and free competition in Graphics Processing Units and Cards' importation and sale into Nebraska and controlled their costs, which violated Neb. Rev. Stat. §59-1601 *et seq*.

92. Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Graphics Processing Units and Cards' prices; (b) allocate Graphics Processing Units and Cards' customers and markets; and (c) caused Plaintiff Chung and the other Nebraska class members to pay higher prices for Graphics Processing Units and Cards that they indirectly purchased from Defendants.

93. In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

      a.    Met to discuss Graphics Processing Units and Cards' customers and markets;

      b.    Agreed to charge prices at certain levels and to increase or maintain prices for Graphics Processing Units and Cards sold in the U.S., including in Nebraska;

      c.    Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

29

d. Allocated Graphics Processing Units and Cards' markets and customers consistent with their illegal agreement.

94. Defendants' conspiracy had the following effects:

a. Graphics Processing Units and Cards' price competition was restrained, suppressed, and eliminated throughout the U.S., including in Nebraska;

b. Graphics Processing Units and Cards' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in Nebraska;

c. Plaintiff Chung and the other Nebraska class members that indirectly purchased Graphics Processing Units and Cards were deprived of free and open market competition and were injured; and

d. Plaintiff Chung and the other Nebraska class members paid more than they otherwise would have for Graphics Processing Units and Cards that they purchased indirectly.

95. Defendants' conspiracy substantially affected commerce within Nebraska.

96. During the Class Period, Nebraskans indirectly purchased millions of dollars of Defendants' Graphics Processing Units and Cards in Nebraska from Defendants. By reason of Defendants' violations of the Nebraska Antitrust Act, Plaintiff Chung and the Nebraska class members paid significantly more for products containing Graphics Processing Units and Cards than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Chung and the Nebraska class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

## COUNT VI
### (Applicable to Plaintiff Benson and the Tennessee Class)
### VIOLATION OF TENNESSEE LAW

97. Plaintiffs incorporate and re-allege the foregoing paragraphs.

98. During the Class Period, Defendants entered into arrangements, contracts, and agreements to fix prices of and allocate markets for Graphics Processing Units and Cards, which

30

arrangements, contracts, and agreements lessened full and free competition in violation of the

TTPA.

99.     Tennessee law permits any person injured indirectly, like the Plaintiffs and class

members, to seek redress for their injuries arising out of illegal conspiracies. Specifically, the

TTPA provides that:

> Any person who is injured or damaged by any such arrangement, contract,
> agreement, trust, or combination described in this part may sue for and recover, in
> any court of competent jurisdiction, from any person operating such trust or
> combination the full consideration or sum paid by the person for any goods,
> wares, merchandise, or articles, the sale of which is controlled by such
> combination or trust.[5]

100.    In *Freeman Indus., LLC v. Eastman Chemical Co.*,[6] the Tennessee Supreme Court

ruled that the TTPA was triggered not by anti-competitive conduct but by "the effect of the anti-

competitive conduct." The Supreme Court also held that the TTPA's applicability, whether

invoked by Tennessee residents *or* non-residents, should be judged by "whether the alleged anti-

competitive conduct affects Tennessee trade or commerce to a substantial degree."

101.    During the Class Period, Defendants illegal conduct substantially affected

Tennessee commerce and caused injury to consumers in Tennessee.

102.    Due to Defendants' price-fixing and market-allocation activities, Graphics

Processing Units and Cards' prices increased illegally in Tennessee despite fluctuations in the

cost of production.

103.    During the Class Period, Graphics Processing Units and Cards' prices didn't

follow the laws of supply and demand existing in competitive markets, including markets in

Tennessee.

---

[5] T.C.A. §47-25-106.

[6] *Supra* note 2.

104.    Defendants' arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, or sold in Tennessee and to manipulate and allocate the market for Graphics Processing Units and Cards marketed, distributed, or sold in Tennessee had the following substantial effects on Tennessee commerce:

> a.    The price of Graphics Processing Units and Cards indirectly purchased by Plaintiff Benson and other Tennessee class members was fixed, raised, maintained, and stabilized at inflated, artificial and non-competitive levels;
>
> b.    Plaintiff Benson and other Tennessee class members lost profits and were deprived of free and open competition in the purchase of Graphics Processing Units and Cards;
>
> c.    Competition in the sale of Graphics Processing Units and Cards was restrained in Tennessee; and
>
> d.    Plaintiff Benson and other Tennessee class members paid higher prices for products containing Graphics Processing Units and Cards than they would have paid absent Defendants' conspiracy.

105.    During the Class Period, Plaintiff Benson and other Tennessee class members indirectly purchased millions of dollars of Defendants' Graphics Processing Units and Cards in Tennessee from Defendants. By reason of Defendants' violations of the TTPA, Plaintiff Benson and the other Tennessee class members paid significantly more for products containing Graphics Processing Units and Cards that they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Benson and the other Tennessee class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

106.    Defendants' conspiracy further substantially affected Tennessee commerce because Defendants, either directly or through their agents, engaged in the following activities in or affecting Tennessee:

a.  Transacted Graphics Processing Units and Cards' business in Tennessee;

b.  Contracted to supply or obtain goods or revenue related to their Graphics Processing Units and Cards' business in Tennessee;

c.  Intentionally availed themselves of the benefits of doing Graphics Processing Units and Cards' business in Tennessee;

d.  Produced, promoted, sold, marketed, and/or distributed Graphics Processing Units and Cards in Tennessee, thereby purposefully profiting from access to Tennessee's direct-purchaser and indirect-purchaser Graphics Processing Units and Cards' markets;

e.  Caused tortious damage in Tennessee by fixing Graphics Processing Units and Cards' prices;

f.  Caused tortious damage in Tennessee by acts or omissions committed outside Tennessee by regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct within Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee;

g.  Committed acts and omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

107.  In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

a.  Met to discuss Graphics Processing Units and Cards' customers and markets;

b.  Agreed to charge prices at certain levels and to increase or maintain prices for Graphics Processing Units and Cards sold in Tennessee;

c.  Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

d.  Allocated Graphics Processing Units and Cards' markets and customers consistent with their illegal agreement.

108.  Defendants' conspiracy had the following substantial effects on Tennessee commerce:

33

    a.    Graphics Processing Units and Cards' price competition was restrained, suppressed, and eliminated in Tennessee;

    b.    Graphics Processing Units and Cards' prices were raised, fixed, maintained, and stabilized at artificially high levels in Tennessee;

    c.    Plaintiffs and class members who indirectly purchased Graphics Processing Units and Cards were deprived of free and open market competition, including in Tennessee, and were injured; and

    d.    Plaintiffs and class members paid more than they otherwise would have for Graphics Processing Units and Cards that they purchased indirectly, including Graphics Processing Units and Cards purchased in Tennessee.

109.    During the Class Period, Tennesseans indirectly purchased millions of dollars of Defendants' Graphics Processing Units and Cards in Tennessee from Defendants. By reason of Defendants' violations of the TTPA, Plaintiff Benson and the Tennessee class members paid significantly more for products containing Graphics Processing Units and Cards than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Benson and the Tennessee class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

## COUNT VII
### (Applicable to all Plaintiffs and the All-Plaintiffs Class)
### UNJUST ENRICHMENT

110.    Plaintiffs repeat and re-allege the foregoing paragraphs.

111.    As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Plaintiffs and the class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its reasonable value to Plaintiffs and the class members.

112.    As a direct and proximate result of Defendants' unjust enrichment, all Plaintiffs

and the All-Plaintiffs Money-Damages class members, or alternatively, all Plaintiffs and the

respective, state-law class members suffered injury and seek an order directing Defendants to

return to them the amount each of them improperly paid to Defendants, plus interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment in their respective class

members' favor and against Defendants, as follows:

A.    That this Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify either or both of the All-Plaintiffs classes or, alternatively, the Tennessee, Arizona, California, and Nebraska classes;

B.    With respect to the All-Plaintiffs Injunctive-Relief class, that this Court rule that Defendants' conspiracy violated the Sherman Act and that injunctive relief under the Clayton Act is appropriate;

C.    With respect to the All-Plaintiffs Money-Damages class, that this Court rule that Defendants' conspiracy violated Tennessee law and that compensatory damages, including treble damages, are appropriate;

D.    Alternatively, with respect to the Arizona class, that this Court rule that Defendants' conspiracy violated Arizona law and that compensatory damages, including treble damages, are appropriate;

E.    Alternatively, with respect to the California class, that this Court rule that Defendants' conspiracy violated California law and that compensatory damages, including treble damages, are appropriate;

F.    Alternatively, with respect to the Nebraska class, that this Court rule that Defendants' conspiracy violated Nebraska law and that compensatory damages, including treble damages, are appropriate;

G.    Alternatively, with respect to the Tennessee class, that this Court rule that Defendants' conspiracy violated Tennessee law and that compensatory damages are appropriate;

H    With respect to the All-Plaintiffs Class, that this Court determine that Defendants were unjustly enriched;

I.      That this Court permanently enjoin Defendants from conspiring to fix Graphics
        Processing Units and Cards' prices and allocating Graphics Processing Units and
        Cards' markets or other injunctive relief as this Court deems appropriate;

J.      That this Court award Plaintiffs post-judgment interest, their costs, and reasonable
        attorneys' fees; and

K.      That this Court order any other relief as it deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all triable issues.

Dated: February 20, 2007                    Respectfully submitted,

                                            Gordon Ball
                                            **BALL & SCOTT**
                                            Suite 601, 550 Main Ave.
                                            Knoxville, TN 37902
                                            Telephone:  (865) 525-7028
                                            Facsimile:  (865) 525-4679
                                            E-mail:       gball@ballandscott.com

                                            Daniel K. Karon
                                            **GOLDMAN SCARLATO & KARON, P.C.**
                                            55 Public Square, Suite 1500
                                            Cleveland, OH 44113-1998
                                            Telephone:  (216) 622.1851
                                            Facsimile:  (216) 622-1852
                                            E-mail:       karon@gsk-law.com

                                            Krishna B. Narine
                                            **LAW OFFICE OF KRISHNA B. NARINE**
                                            7839 Montgomery Ave.
                                            Elkins Park, PA 19027
                                            Telephone:  (215) 771-4988
                                            Facsimile:  (215) 782-3241
                                            E-mail:       knarine@kbnlaw.com

Isaac L. Diel
**SHARP McQUEEN, P.A .**
Financial Plaza
6900 College Boulevard, Suite 285
Overland Park, KS 66211
Telephone:     (913) 661-9931
Facsimile:      (913) 661-9935
E-mail:         dslawkc@aol.com

*Attorneys for Plaintiffs and the Respective, Alternative Classes*