EXHIBIT B

1

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF CALIFORNIA

5

6    In re DYNAMIC RANDOM ACCESS
7    MEMORY (DRAM) ANTITRUST
     LITIGATION                                    No. M 02-1486 PJH
8    _____/
                                                   **ORDER GRANTING IN PART**
9    This Document Relates to:                     **AND DENYING IN PART DEFENDANTS'**
                                                   **MOTIONS FOR JUDGMENT ON**
10   All Indirect Purchaser Actions                **THE PLEADINGS**
     _____/
11

12          Defendants' motions for judgment on the pleadings came on for hearing on

13   December 6, 2006 before this court.  Plaintiffs, indirect purchasers ("plaintiffs"), appeared

14   through their counsel, Allan Steyer, Josef D. Cooper, Tracy B. Kirkham, Daniel E.

15   Gustafson, Christopher L. Lebsock, Terry Gross, Michael P. Lehman, Francis O. Scarpula,

16   Daniel J. Mogin, and Jill M. Manning.  Defendants appeared through their counsel, Julian

17   Brew, Kenneth R. O'Rourke, Peter Nemerovski, Joshua Stambaugh, Jonathan Houden,

18   Ronald C. Redcay, Joel S. Sanders, Steven H. Bergman, Andrew P. Deshazo, and

19   Alejandro Steyer.  Having read all the papers submitted and carefully considered the

20   relevant legal authority, the court hereby GRANTS the motions for judgment on the

21   pleadings in part and DENIES the motions for judgment on the pleadings in part, for the

22   reasons stated at the hearing, and as follows.

23                                  **BACKGROUND**

24          The actions before the court are part of a larger antitrust MDL action, in which

25   plaintiffs generally allege a horizontal price-fixing conspiracy carried out by numerous

26   defendants, in violation of various state and federal antitrust laws.

27          Plaintiffs in the instant action before the court allege that they indirectly purchased

28

**United States District Court**

For the Northern District of California

dynamic random access memory ("DRAM") from defendants.[1]  DRAM is a type of semiconductor chip used in computers and other electronic equipment.  Defendants are either foreign corporations, or U.S. subsidiaries of foreign corporations, who manufacture and sell DRAM in the United States.[2]

Specifically, plaintiffs – on behalf of themselves and all others similarly situated – allege that they either (1) indirectly purchased DRAM from one or more of the defendants for use in manufacturing electronic devices for resale; or (2) indirectly purchased DRAM from one or more of the defendants for end use and not for resale.  See Petro Class Action Complaint ("Complaint"), ¶¶ 7-17.  Regardless whether plaintiffs purchased DRAM for end use or for resale, plaintiffs allege that they were forced to pay artificially high prices for DRAM, as a result of defendants' unlawful conspiracy and agreement to raise, fix, maintain, and/or stabilize prices for DRAM in the United States.  See, e.g., Complaint, ¶¶ 71, 74.

Plaintiffs' complaint, styled as a class action, alleges five causes of action against defendants: (1) violation of section 1 of the Sherman Act; (2) violation of the California Cartwright Act; (3) violation of California Business and Professions Code §§ 16720 et seq.; (4) violation of various state antitrust and unfair competition laws; and (5) violation of state consumer protection and unfair competition laws.  See id. at ¶¶ 70-142.  The latter two causes of action, however, are each in turn comprised of numerous individual state law claims:  the fourth cause of action alleges violations of 22 states' antitrust and unfair competition laws, and the fifth cause of action alleges violations of 22 states' consumer protection and unfair competition laws.

---

[1]    For purposes of pretrial proceedings, all parties in the indirect purchaser cases have agreed to litigate under one lead case – Petro Computer Sys., Inc. v. Micron Technology et al., No. C 05-2472 PJH.

[2]    The specific defendants at issue are as follows: Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Infineon Technologies AG; Infineon Technologies North America Corporation; Mosel Vitelic Corporation; Mosel Vitelic Corporation USA; Nanya Technology Corporation; Nanya Technology Corporation USA; Elpida Memory, Inc.; Elpida Memory (USA), Inc.; Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; Winbond Electronics Corporation; Winbond Electronics Corporation America, Inc.; and NEC Electronics America, Inc. (collectively "defendants").

United States District Court

For the Northern District of California

1    Defendants now move for judgment on the pleadings with respect to plaintiffs'
2  complaint. They have filed two separate motions:  the first seeks judgment on the
3  pleadings with respect to plaintiffs' second and fourth causes of action. The second seeks
4  judgment on the pleadings with respect to plaintiffs' fifth cause of action.[3]

5                                    **DISCUSSION**

6  **I.    Legal Standard**

7    Federal Rule of Civil Procedure 12(c) provides that any party may move for
8  judgment on the pleadings "after the pleadings are closed, but within such time as not to
9  delay the trial." See Fed. R. Civ. Proc. 12(c).  A motion for judgment on the pleadings
10 challenges the legal sufficiency of the opposing party's pleadings, and the allegations
11 contained therein.

12    The standard applied by the court in treating a motion for judgment on the pleadings
13 is the same as that applied by the court in considering motions to dismiss under FRCP
14 12(b)(6).  In short, judgment on the pleadings is appropriate when, even if all material facts
15 in the pleading under attack are true, the moving party is entitled to judgment as a matter of
16 law. See, e.g., Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550
17 (9th Cir. 1989).  The Supreme Court, in passing on the 12(b)(6) standard in the antitrust
18 context recently, also noted that while a complaint attacked by a motion to dismiss for
19 failure to state a claim upon which relief can be granted does not need detailed factual
20 allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires
21 "more than labels and conclusions, and a formulaic recitation of the elements of a cause of
22 action will not do." See Bell Atlantic Corp. v. Twombly, --- S.Ct. ---, 2007 WL 1461066
23 (2007).  Although Twombly dealt with a motion to dismiss a section 1 conspiracy claim,

24  _____

25    [3]    Plaintiffs have also filed two separate requests for judicial notice, and defendants
     have submitted at least one set of objections thereto.  Plaintiffs specifically ask the court to
26 grant judicial notice as to 23 different orders and pleadings that were entered in various cases
     throughout the country, as well as three different class action complaints filed in California
27 state courts.  Having considered the requests, and defendants' objections, the court hereby
     GRANTS plaintiffs' request for judicial notice, as it finds the subject matter proper for judicial
28 notice pursuant to Federal Rule of Evidence 201.

given the similarity in standards to be applied on motions to dismiss and motions for judgment on the pleadings, the court finds <u>Twombly</u>'s language instructive here.

Rule 12(c) does not mention leave to amend; however, courts generally have discretion in granting 12(c) motions with leave to amend, particularly in cases where the motion is based on a pleading technicality.  <u>See, e.g., Swanson v. United States Forest Serv.</u>, 87 F.3d 339, 343 (9th Cir.1996)(Leave to amend generally within discretion of trial court).  There is a strong policy in favor of allowing amendment, unless amendment would be futile, results from bad faith or undue delay, or will unfairly prejudice the opposing party."  <u>Kaplan v. Rose</u>, 49 F.3d 1363, 1370 (9th Cir.1994).

Courts also have discretion to grant dismissal on a 12(c) motion, in lieu of judgment, on any given claim.  <u>See, e.g., Amersbach v. City of Cleveland</u>, 598 F.2d 1033, 1038 (6th Cir. 1979), <u>disapproved on other grounds in Garcia v. San Antonio Metropolitan Transit Authority</u>, 469 U.S. 528 (1985); <u>see also McGlinchy v. Shell Chemical Co.</u>, 845 F.2d 802, 810 (9th Cir. 1988)(affirming dismissal of plaintiffs' antitrust claim by judgment on pleadings).

**II.    Motion for Judgment on the Pleadings re Second and Fourth Claims for Relief**

Defendants bring two motions for judgment on the pleadings.  The first attacks plaintiffs' second and fourth causes of action as pled in the complaint.  Plaintiffs' second cause of action alleges a violation of California's state antitrust statute – the Cartwright Act.  <u>See</u> Cal. Bus. & Prof. Code § 16720.   Plaintiffs' fourth cause of action alleges a violation of twenty-two individual state antitrust laws, although defendants challenge plaintiffs' claims under only fourteen of those laws.

Generally speaking, defendants' challenge to both causes of action is rooted in the same argument: that plaintiffs cannot allege antitrust standing under any of the state laws in question, and their claims under each are accordingly barred.

1.    Antitrust Standing Principles

The concept of "antitrust standing" has its roots in federal law.  It refers to the

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1 standing requirements that a plaintiff must satisfy in all private antitrust suits seeking

2 monetary damages under the federal antitrust statutes.  See 15 U.S.C. § 15(a).  A plaintiff

3 seeking monetary damages for antitrust violations must prove that he or she has been (1)

4 "injured in his business or property;" (2) "by reason of anything forbidden in the antitrust

5 laws...".  See 15 U.S.C. § 15(a).

6      Under the first element, a plaintiff must demonstrate injury – or the fact of damage –

7 to his or her business or property interests, which injury is causally linked to an antitrust

8 violation.  Generally speaking, allegations that plaintiff consumers have paid higher prices

9 for goods purchased for personal use due to defendants' conduct have satisfied this

10 element.  See, e.g., Reiter v. Sonotone Corp., 442 U.S. 330, 342 (1979)("where petitioner

11 alleges a wrongful deprivation of her money because the price of the [good] she bought

12 was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged

13 an injury in her "property" under § 4").  Under the more critical second element, referred to

14 as "antitrust injury," a plaintiff must also demonstrate "injury of the type the antitrust laws

15 were intended to prevent."  In other words, a plaintiff must connect any alleged injury to the

16 purposes of the antitrust laws.  See Atl. Richfield Co. v. USA Petroleum, 495 U.S. 328, 334

17 (1990); American Ad Mgmt., Inc. v. Gen. Tel. Co., 190 F.3d 1051, 1055 (9th Cir. 1999).

18      Even assuming, however, that a plaintiff is able to make this showing, the antitrust

19 standing inquiry is not at an end.  This is because a plaintiff's right to sue for money

20 damages is nonetheless subject to certain limitations, based upon policies found by the

21 courts to be inherent in the structure and purpose of the antitrust laws.  See, e.g., Cargill,

22 Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n.5 (1986)(although showing of

23 antitrust injury is necessary, it still is "not always sufficient to establish standing under

24 section 4 because a party may have suffered antitrust injury but may not be the proper

25 plaintiff under section 4 for other reasons").  Where a plaintiff's injury, for example, is

26 derivative of a more direct injury to some other person, and that person would have a

27 strong motivation to pursue its own antitrust claim against the defendant, standing is likely

28

United States District Court
For the Northern District of California

1  to be denied.  This is the rationale underlying Illinois Brick Co. v. Illinois, 431 U.S. 720

2  (1977), in which the Supreme Court held that indirect purchasers are too remote to suffer

3  true "antitrust injury," and therefore do not have standing under federal antitrust law to

4  pursue antitrust claims.

5  In recognition of this and other concerns that impact the antitrust standing analysis,

6  the Supreme Court has fashioned a general balancing test to be used in determining

7  whether a plaintiff is a proper party to bring an antitrust claim.  See Assoc. Gen.

8  Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 (1983)("AGC").

9  The AGC test, as it is called, enumerates a variety of factors that are employed in

10  "evaluat[ing] the plaintiff's harm, the alleged wrongdoing by the defendants, and the

11  relationship between them," in order to determine standing.  Id. These factors include the

12  nature of the injury alleged, the directness of the injury, the speculative nature of the harm,

13  the risk of duplicative recovery, and the complexity in apportioning damages.  The Ninth

14  Circuit has embraced this test, announcing its commitment to the AGC factors in American

15  Ad Mgmt., Inc. v. Gen. Tel. Co., 190 F.3d 1051, 1054-55 (9th Cir. 1999).

16  Although this discussion highlights federal antitrust standing principles, these federal

17  principles – and in particular, federal concern over the remoteness of a plaintiff's injury –

18  are central to defendants' arguments and the court's discussion here.  For although

19  defendants' motion challenges the viability of plaintiffs' state antitrust claims and does not

20  directly invoke the federal antitrust scheme, the gist of defendants' motion is (1) that even

21  under state law, plaintiffs must independently prove antitrust standing; (2) that antitrust

22  standing under state law should be assessed using the federal AGC factors; and (3) that

23  plaintiffs cannot meet the ACG requirements in any event.

24  With these principles and background in mind, the court turns to the two claims that

25  defendants challenge.

26  2.    Cartwright Act

27  Defendants challenge plaintiffs' ability to bring their second claim for relief alleging a

28

6

violation of California's antitrust statute, the Cartwright Act.[4]  The Cartwright Act prohibits unlawful restrictions on competition, and grants "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by [the Act]" the right to bring a civil action for treble damages, "regardless of whether such injured person dealt directly or indirectly with the defendant."  See Cal. Bus. & Prof. Code §§ 16720, 16726, 16750.  Defendants essentially argue that, although California is an Illinois Brick repealer state that allows indirect purchasers to sue under the Cartwright Act, plaintiffs still cannot allege the requisite antitrust standing, since even as indirect purchasers, they cannot satisfy the AGC factors.  Defendants presume, as a matter of course, that the AGC standing test applies to claims arising under the state's Cartwright Act.

Plaintiffs, by contrast, contend that California law is much broader than federal law relating to antitrust standing, and the fact that the Cartwright Act expressly repeals Illinois Brick and allows indirect purchasers to sue is dispositive of defendants' standing arguments, without need of recourse to the AGC factors.  While plaintiffs do not go on to specifically address the question whether the AGC antitrust standing factors employed under federal law are satisfied here, they do assert that, contrary to defendants' contention, there are no concerns that are raised here with respect to duplicative or speculative damages.

Preliminarily, the court notes that at the hearing on the instant motions, defendants clarified for the court that they do not actually seek dismissal on standing grounds of all plaintiffs' claims.  Rather, their motion is targeted only at those plaintiffs who allege that they paid artificially inflated prices "for personal computers and other products in which DRAM is a component...".  See Complaint, ¶ 74.  Defendants did not further clarify whether this means that their motion is targeted at all plaintiffs who allege they paid higher prices for products in which DRAM is a component – regardless whether they also made other

---

[4]    Defendants' briefs are somewhat confusing on this point, since they include discussion of the Cartwright Act within the broader discussion of antitrust standing as to all fourteen states at issue.

United States District Court
For the Northern District of California

purchases of DRAM that was not in component form – or only at plaintiffs' specific claims based on purchases in which DRAM is a component.[5]  Without further clarification, therefore, it is impossible to tell whether defendants seek judgment as to the former, or the latter.

Given defendants' silence on this issue, however, the court interprets defendants' arguments as reaching the narrower issue only, and specifically targeted, therefore, only at those claims raised by plaintiffs that are based on purchases of products in which DRAM is a component.  Accordingly, the issues actually before the court, and which the court must decide, are (a) whether the <u>AGC</u> standing factors apply to Cartwright Act claims; and (b) if so, whether those factors are satisfied with respect to plaintiffs' claims based on indirect purchases of products in which DRAM is a component.

            a.    whether <u>AGC</u> factors apply

Plaintiffs urge the court to conclude that because California's Cartwright Act expressly allows indirect purchasers to sue, no other factors need be satisfied in order for antitrust standing to be found.  In other words, plaintiffs argue that they have standing here by virtue of their indirect purchaser status, and need not separately prove standing under the general <u>AGC</u> factors or otherwise.

As a general matter, plaintiffs are correct – and defendants concede – that California's Cartwright Act is an <u>Illinois Brick</u> repealer statute, under which indirect purchaser standing is permissible in private actions alleging violations of antitrust law.  <u>See</u> Cal. Bus. & Prof. Code § 16750; <u>see also Union Carbide v. Superior Court</u>, 36 Cal. 3d 15, 20 (1984).  However, while the Cartwright Act directly contradicts federal law insofar as indirect purchaser standing is generally concerned, it does not follow from this either that indirect purchaser status is itself sufficient under California law to establish antitrust

---

        [5]    The possibility that plaintiffs may be alleging claims based on purchases of both component DRAM and non-component DRAM is evidenced by the ambiguity of plaintiffs' allegations.  <u>See, e.g.</u>, Complaint, ¶¶ 9-17 (stating only that plaintiffs indirectly purchased DRAM "for end use and not for resale," without distinguishing between purchases of DRAM, and purchases of DRAM as a product component).

standing, or that California law necessarily eschews the general test for antitrust standing as set forth in <u>AGC</u>.  For as defendants point out, the question whether indirect purchasers have standing under state law, and the question whether antitrust plaintiffs – which may include indirect purchasers – have antitrust standing for a particular claim, are two "analytically distinct" issues.  An affirmative answer to the former simply does not compel an affirmative finding of the latter.

  While neither party has cited any conclusive state authority on this point, the conclusion that indirect purchaser standing is distinct from antitrust standing under California state law is nonetheless warranted, in view of persuasive federal and state authority.  First, and as noted above, consideration of federal authorities reveals that the federal antitrust standing inquiry is based on consideration of *more* than merely a plaintiff's status as direct or indirect purchaser.  Standing may be found lacking, for instance, for reasons separate and apart from the fact that plaintiffs are indirect purchasers.  <u>See, e.g., Pool Water Prods. v. Olin Corp.</u>, 258 F.3d 1024, 1034 (9th Cir.2001)(if plaintiff's injury stems from, e.g., "aspects of the defendant's conduct that are beneficial or neutral to competition," there is no antitrust injury and as a result, no antitrust standing).  This reasoning – which underscores the federal courts' determination that antitrust standing must be affirmatively demonstrated with regard to *other* factors – logically should apply to consideration of the Cartwright Act, as well.  <u>See, e.g., Mailand v. Burckle</u>, 20 Cal. 3d 367, 376 (1978)(federal cases interpreting the Sherman Act are applicable in construing [California] state laws").  And it counsels in favor of concluding that the Cartwright Act's mere recognition that indirect purchasers may sue is distinct from an automatic grant of antitrust standing generally, and that antitrust standing must be determined with reference to other factors aside from purchaser status.

  Second, consideration of California state authorities compels the same conclusion.  For even though no case law answers the question directly, the case law that does exist – and which even plaintiffs rely on – does not suggest that a finding of indirect purchaser

**United States District Court**

For the Northern District of California

1    standing is tantamount to a finding of antitrust standing.  Plaintiffs rely, for example, on

2    Cellular Plus, Inc. v. Superior Court of San Diego County, 14 Cal. App. 4th 1224 (1993).

3    While they are correct that the Cellular Plus court noted that the concept of "antitrust injury"

4    – a component of antitrust standing – is broader than under federal case law, and further

5    cited to California's Illinois Brick repealer statute as proof of this fact, the court also

6    expressly noted that "[t]he exact parameters of 'antitrust injury' under [the Cartwright Act]

7    have not yet been established through either court decisions or legislation." See 14 Cal.

8    App. 4th at 1234.  The Cellular Plus court then held that indirect purchasers of cellular

9    services had alleged sufficient antitrust injury to maintain actions for wholesale and retail

10   price-fixing, by only generally concluding that the plaintiffs alleged "injuries of the type [the

11   Cartwright Act] seeks to prevent and which stem from the 'anticompetitive aspect' of

12   [defendants'] alleged conduct." See 14 Cal. App. 4th at 1234.  Accordingly, while Cellular

13   Plus properly took note of the Cartwright Act's express provision allowing indirect

14   purchasers to seek private remedies, it did not actually hold that indirect purchaser status is

15   all that must be demonstrated in order to satisfy antitrust injury or standing.  Indeed, the

16   Cellular Plus court did not even consider the question whether the AGC factors apply in

17   determining antitrust standing, thereby leaving the question open.

18           In short, and in view of the above, the court is of the opinion that the Cartwright Act's

19   grant of indirect purchaser standing, while ensuring that plaintiffs' status as indirect

20   purchasers cannot *bar* their claim under the Cartwright Act, does not in actuality set forth

21   the sum total of what a given plaintiff must establish in order to satisfy antitrust standing

22   generally.

23           Naturally, this begs the question what precise showing must *affirmatively* be made

24   by plaintiffs – both direct *and* indirect purchasers – to satisfy antitrust standing

25   requirements under the Cartwright Act.  For the reasons that follow, defendants have

26   persuaded the court that the AGC test originally set forth by the Supreme Court in

27   interpreting antitrust standing under the federal antitrust statutes, is the appropriate guide

28

United States District Court

For the Northern District of California

1  to follow.

2         Once again, there is no California case directly on point that conclusively sets forth

3  the parameters of antitrust standing under the Cartwright Act.  However, while California

4  state courts have not specifically weighed in on the issue, the Ninth Circuit has.  In

5  Knevelbaard Dairies v. Kraft Foods, Inc., the Ninth Circuit undertook an exhaustive analysis

6  of the antitrust standing doctrine in relation to both federal law and the Cartwright Act.  See

7  232 F.3d 979 (9th Cir. 2000).  The Ninth Circuit acknowledged that distinctions exist

8  between both laws, and the limited role that federal law provides in furnishing precedent

9  under the Cartwright Act.  Nonetheless, the court still found that "[a]ntitrust standing is

10 required under the Cartwright Act."  See id. at 987.  The court simply reconciled the

11 differences in California law by stating that, within the framework of the antitrust standing

12 inquiry, "California law affords standing more liberally than does federal law."  Id.  The Ninth

13 Circuit then proceeded to analyze the case within the framework of the AGC factors, and

14 when the time came to consider the "directness of injury" factor, took into account the

15 broader principles relating to indirect purchasers provided by state law.

16        At least one California court has also applied the AGC antitrust standing factors to

17 antitrust claims under the Cartwright Act, although it did not engage in a detailed discussion

18 of the issue.  In Vinci v. Waste Mgmt., Inc., 36 Cal. App. 4th 1811 (1995), a state appellate

19 court applied the AGC factors in determining whether the particular plaintiff before it had

20 standing.  While plaintiff is correct that the case is distinguishable on its facts (since plaintiff

21 was not an indirect purchaser, there were no price-fixing allegations, and the case arose in

22 the employment context), the relevant point is that the state court applied the broader

23 antitrust standing test under AGC to the Cartwright Act.

24        In conclusion, then, and in view of the Ninth Circuit and California authorities

25 discussed above, the court finds that plaintiffs here proceeding under the Cartwright Act are

26 required to satisfy general antitrust standing requirements enunciated by the Supreme

27 Court in AGC, and embraced by the Ninth Circuit in Knevelbaard.  Plaintiffs cannot satisfy

28

11

**United States District Court**
For the Northern District of California

1   antitrust standing requirements by simply invoking their status as indirect purchasers.

2           b.    whether <u>AGC</u> factors are satisfied

3        In view of the court's conclusion that plaintiffs alleging claims based on purchases of

4   products in which DRAM is a component are required to satisfy the relevant <u>AGC</u> factors to

5   establish antitrust standing, the final issue to be addressed is whether these plaintiffs have,

6   in fact, done so.  In deciding the issue, the court must "evaluate the plaintiff[s]' harm, the

7   alleged wrongdoing by the defendants, and the relationship between them."  <u>See</u>

8   <u>Knevelbaard</u>, 232 F.3d at 987.  The factors relevant to this evaluation are, once again:  (1)

9   the nature of the plaintiffs' injury; (2) the directness of the injury; (3) the speculative nature

10  of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning

11  damages.  <u>See id.</u>; <u>see also American Ad Mgmt.</u>, 190 F.3d at 1054-55.

12       Defendants argue that standing under the <u>AGC</u> factors should be held lacking here,

13  for the following reasons:  the plaintiffs here were not participants in the relevant market for

14  the DRAM at issue, since many only purchased the DRAM in question in end products like

15  computers, or as end users; the distribution chain is long and complicated; calculating and

16  apportioning damages would be complex, and the economic analysis speculative; more

17  direct victims exist and have sought relief (i.e., the related direct purchaser litigation); and it

18  would be difficult to determine a non-duplicative measure of damages.  Defendants rely on

19  recent case law in the rubber tires ("rubber tire cases") and the credit card industries

20  ("credit card cases"), in which similar indirect purchasers' claims were dismissed for lack of

21  standing at the pleading stage.  <u>See, e.g., Crouch v. Crompton Corp.</u>, 2004 WL 2414027

22  (N.C. Super. Ct., 2004);  <u>Stark v. Visa U.S.A., Inc.</u>, 2004 WL 1879003 (Mich. Cir. Ct. 2004).

23       Plaintiffs, for their part, challenge defendants' reliance on the credit card cases and

24  the rubber tire cases, arguing their facts are distinguishable from the present facts.  They

25  contend, furthermore, that it is irrelevant whether plaintiffs purchased DRAM standing

26  alone, or as part of an ultimate product (e.g., computers).  The seminal point, according to

27  plaintiffs, is that where they are a link in the chain of distribution for an overcharged

28

**United States District Court**
For the Northern District of California

1   product, then standing exists.  Plaintiffs invoke the "Microsoft cases," a line of cases in

2   which plaintiffs assert that standing was found to exist.  See, e.g., Gordon v. Microsoft

3   Corp., 2001 WL 366432 (D. Minn. 2001).

4          The issues raised by the parties are complicated, and devoid of ready or simple

5   answer.  Ultimately, however, in view of the AGC factors that are applied and considered

6   below, the court believes that it is defendants who present the more persuasive arguments.

7   See, e.g., Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S.

8   519; Am. Ad Mgmt., Inc. v. Gen. Tel. Co., 190 F.3d at 1054-55 (setting forth AGC factors).

9                          1.     antitrust injury

10         A plaintiff may only pursue an antitrust action if it can show antitrust injury, which is

11  to say "injury of the type the antitrust laws were intended to prevent and that flows from that

12  which makes defendants' acts unlawful."  See American Ad. Mgmt, 190 F.3d at 1055.  The

13  Ninth Circuit has identified four requirements for antitrust injury, which serve as a helpful

14  guide here:  (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from

15  that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were

16  intended to prevent.  Id.

17         Plaintiffs here have satisfactorily alleged both unlawful conduct – by way of

18  defendants' conspiracy to horizontally restrain trade – and that such conduct caused

19  plaintiffs to suffer injury in the form of having paid artificially high prices for DRAM.  See,

20  e.g., Complaint, ¶¶ 80, 81, 83; see also American Ad. Mgmt., 190 F.3d at 1056 (allegations

21  of injury caused by unlawful conduct sufficient if they allege that plaintiff suffered from

22  defendants' participation in alleged conspiracy).  Similarly, the injury that plaintiffs allege –

23  i.e., payment of artificially high prices for DRAM – flows directly from the alleged conspiracy

24  to fix and raise the price of DRAM.  The more troubling issue for the court, however,

25  centers on the fourth element identified by the Ninth Circuit above – i.e., whether plaintiffs'

26  injury is "of the type the antitrust laws were intended to prevent."

27         In passing on this question, both the Supreme Court and the Ninth Circuit have

28

1  noted that a central concern of the antitrust injury analysis is in "protecting the economic

2  freedom of participants in the relevant market." <u>See</u> Assoc. Gen. Contractors, 459 U.S. at

3  538; <u>American Ad. Mgmt.</u>, 190 F.3d at 1057.  To that end, antitrust standing is granted only

4  where the plaintiff is a participant in the relevant market – e.g., a consumer or competitor in

5  the relevant market alleged.  <u>See id</u>.

6      Here, defendants assert that, since plaintiffs purchased DRAM as a component of

7  other products – such as computers – these plaintiffs are not participants in the alleged

8  market for DRAM.  Rather, they are participants in separate, albeit related, markets for

9  products that include DRAM.  As such, defendants claim that plaintiffs have not alleged

10  antitrust injury, since they do not have grounds from which to argue that they are

11  participants in the allegedly restrained market.

12      This argument is persuasive.  As defendants point out, cases that have considered

13  similar price-fixing claims and other section 1 claims in the rubber tire and credit card

14  industries have found that indirect purchasers are not participants in the relevant market

15  where the ultimate goods they purchased – and which were the alleged source of artificially

16  raised prices – were part of a market that was secondary to the allegedly price-tied market.

17  <u>See, e.g., Crouch v. Crompton Corp.</u>, 2004 WL 2414027 at *24 (noting that plaintiff, as

18  purchaser of rubber product rather than rubber chemicals, was in "market secondarily

19  affected by the restraint in the original chemical market"); <u>Stark v. Visa U.S.A., Inc.</u>, 2004

20  WL 1879003 at *2 (no standing where "plaintiff is not a consumer or competitor in the

21  allegedly restrained market").

22      Indeed, the Visa debit card cases, typified by the <u>Stark</u> case and others like it, are

23  instructive.  In these cases, the indirect purchasers were ultimate consumers of various

24  "goods" that they purchased from merchants who were themselves the alleged victims of

25  defendants' conspiracy to illegally tie products in violation of section 1.  The numerous

26  courts considering antitrust standing in this context generally found that, although an

27  artificially raised price had been passed down from defendants to merchants in the market

28

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   for credit card services, the indirect purchasers were not participants in the actual market

2   for credit card services, just for goods sold by those merchants.  See, e.g., Stark, 2004 WL

3   1879003 at *2; Strang v. Visa U.S.A., Inc., 2005 WL 1403769, *4 (Wis. Cir. Ct. Feb. 8,

4   2005).  Similarly, with respect to the rubber chemical case relied on by defendants, the

5   court found that there were two relevant markets – one for rubber chemicals, which was the

6   price-fixed market, and a second one for the tires that were made with the price-fixed

7   chemicals.  In holding that antitrust standing was lacking, the court held that the indirect

8   purchasers – who had purchased the allegedly price-fixed tires from retailers – were not

9   participants in the market, and were only secondarily affected.  See Crouch, 2004 WL

10  2414027 at *24.

11       These factual scenarios are analogous to the situation before the court here.

12  Plaintiffs are indirect purchasers and consumers who purchased DRAM as a component in

13  computers and other electronic products, for "end use and not for resale."  See Complaint,

14  ¶¶ 9-17, 74.  However, the market that plaintiffs allege as the source for the purportedly

15  illegal price-fixing conspiracy was the general market for DRAM, a market that is distinct

16  from the market for electronic products that include DRAM.  See, e.g., Complaint, ¶ 41.  As

17  such, plaintiffs who are purchasing products in which DRAM is a component, rather than

18  DRAM itself, are participating in a secondary market that is incidental to the primary price-

19  fixed market (i.e., the market for DRAM modules themselves).

20       Plaintiffs urge the opposite conclusion with reliance on several Microsoft cases, but

21  these cases are inapposite.  The Microsoft cases they rely on deal with class certification,

22  and fail to frame their inquiry in terms of antitrust standing.  See, e.g., Gordon, 2001 WL

23  366432 at *11; Bellinder v. Microsoft Corp., (D. Kan. Sept. 7, 2001).  For that reason, these

24  class certification decisions, while they may undoubtedly be relevant at the class

25  certification stage, are of limited relevance now.

26       In sum, for all the above reasons, the court believes that this first factor – i.e., the

27  nature of plaintiffs' antitrust injury – weighs against standing.

28

15

2.      Directness of the injury

This factor looks to whether plaintiffs' alleged injury was the direct result of defendants' alleged anticompetitive conduct.  To assess the directness of plaintiffs' injury, the court must look "to the chain of causation between [plaintiffs'] injury and the alleged restraint in the [alleged] market."  See American Ad. Mgmt., 190 F.3d at 1058; Assoc. Gen. Contractors, 459 U.S. at 540.  The fact that plaintiffs are indirect purchasers does not, as mentioned previously, have negative bearing on this factor, as plaintiffs have explicitly been granted indirect purchaser standing pursuant to state law.  Accordingly, the court must simply consider whether, as indirect purchasers, there is a direct link in the causation chain between defendants' alleged conspiracy to restrain prices, and the artificially high prices paid by plaintiffs who purchased products in which DRAM is a component.

On balance, the court finds that this is not the case.  To be sure, in most instances, some portion of a price-fixed cost gets passed directly along to the ultimate consumer, and this could readily apply to a DRAM component that was eventually incorporated into an end product.  However, as the Crouch court accurately noted, "the directness can be impacted by the nature of the item subject to price-fixing, be it a component, labor cost, or something used in the manufacturing process."  See 2004 WL 2414027 at *24.  This is because the nature of the item "can influence the directness of the impact on the price of the end product at retail."  Id.

Here, DRAM's nature as a ubiquitous component in all manner of personal electronic devices that are purchased for end use, lessens the directness of its impact on price.  For example, while plaintiffs have alleged that one example of an electronic device containing DRAM might be a personal computer, they have simultaneously alleged that personal computers are but one of *many* examples of electronic devices containing DRAM, and they have furthermore failed to allege the precise type of electronic device that any given plaintiff purchased for end use.  See, e.g., Complaint at ¶ 5 (DRAM "means the memory chip most commonly used in electronic devices, *such as personal computers,*

around the world")(emphasis added).  As such, it is possible and even likely that plaintiffs have purchased DRAM not only in computers, but in other products.  It requires no leap of logic to conclude that each product in which DRAM is a component, contains numerous other components, all of which *collectively* determine the final price actually paid by plaintiffs for the final product.  In other words, the price for the actual product paid by plaintiffs is reflective of much more than just the component price for DRAM.  Yet plaintiffs' complaint sets forth no allegations that demonstrate that, within the final purchase price of a given product purchased by plaintiffs for "end use," the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable.  Seen from this viewpoint, the directness of plaintiffs' injury – with respect to those who purchased DRAM as a component product – is too remote to warrant tipping this factor in favor of standing.  See also, e.g., Crouch, 2004 WL 2414027 at * 24 ("[t]he smaller the component, the less likely there will be impact on the final price.").

For these reasons, this factor also weighs against standing.

3.      Speculative Nature of the Harm, Risk of Duplicative Recovery, Complexity in Apportioning Damages

The final three factors can be considered together – the speculative nature of the harm, the risk of duplicative recovery, and the complexity in apportioning damages.  See, e.g., Assoc. Gen. Contractors, 459 U.S. at ; Am. Ad Mgmt., Inc. v. Gen. Tel. Co., 190 F.3d 1051, 1054-55 (9th Cir. 1999).

First, with respect to the first and third of these factors, the court's consideration of them overlaps.  Defendants justly point out that the injury suffered by the indirect purchaser plaintiffs is unduly speculative, and that damages would be difficult to apportion, in view of the fact that the plaintiffs in question purchased their DRAM in the form of a component product.  There are a variety of factors, for example, that could have influenced the price that each plaintiff paid for their computer (or other products) – the cost of various other components, whether those costs were themselves artificially high, etc.  In such a situation, as defendants note, courts have found that these two factors weigh against standing.  See,

.e.g. Weaver v. Cabot Corp., 2004 WL 3406119 (N.C. Super Ct. 2004).  Indeed, as the Weaver court – which considered allegations of price-fixing in the rubber chemical industry – stated, plaintiffs who are in secondary markets in which they purchase the price-fixed product as a component, would need to allege that the secondary market sellers themselves were in an oligopoly and fixing prices, in order to demonstrate non-speculative damages.  See id. at *1.  In Weaver, plaintiffs who had purchased rubber tires as part of the secondary market – the market for rubber chemicals used to make the tires was the primary restrained market – were held to lack standing.  So here.  Plaintiffs, who have purchased DRAM as a component in products such as personal computers and other devices, would need to allege that the market for personal computers and other secondary markets was itself restrained as a result of defendants' conduct, in order to establish that the damages ultimately suffered by them are sufficiently concrete, and capable of determination.  These two factors, therefore, weigh against standing.

As for the risk of duplicative recovery, however, plaintiffs have the better argument.  States such as California, which have repealed Illinois Brick and allowed indirect purchasers to sue for antitrust violations, have necessarily made the policy decision that duplicative recovery may permissibly occur.  Duplicative recovery is, in many if not all cases alleging a nationwide conspiracy with both direct and indirect purchaser classes, a necessary consequence that flows from indirect purchaser recovery.  Accordingly, it is no bar against standing, and this factor does not weigh against standing.

In sum, however, after consideration of all the AGC factors, and for all the above reasons, the court ultimately concludes that there are more reasons to deny standing in the instant case.  Accordingly, the court finds that the indirect purchaser plaintiffs whose claims are based on the purchase of products in which DRAM is a component, lack standing to assert a claim under California's Cartwright Act.  As such, defendants' motion for judgment on the pleadings, with respect to these particular claims, is GRANTED.

3.    State Antitrust Claims

Defendants also challenge plaintiffs' fourth claim for relief, which alleges violations of

18

United States District Court

For the Northern District of California

1    twenty-two different states' antitrust laws.  As with plaintiffs' second claim for relief under

2    the Cartwright Act, defendants argue that, with respect to thirteen[6] of these state antitrust

3    laws, no antitrust standing exists for those plaintiffs whose claims are based on purchases

4    of products in which DRAM is a component.  The thirteen states are:  Arizona, Kansas,

5    Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina,

6    North Dakota, South Dakota, and Wisconsin.  Defendants additionally argue that, with all

7    plaintiffs' claims under five state laws – Ohio, West Virginia, Alabama, South Dakota, and

8    Pennsylvania – judgment on the pleadings is also warranted for other reasons.

9            a.    antitrust standing

10   Defendants contend that plaintiffs' claims under the thirteen state antitrust statutes at

11   issue fail for lack of antitrust standing.  Their arguments mimic those made in connection

12   with plaintiffs' Cartwright Act claim.  In essence, defendants argue that, although each state

13   is an Illinois Brick repeater state, antitrust standing must still be determined under each

14   state statute with reference to the AGC factors.  Defendants claim further that plaintiffs with

15   claims based on purchases of products in which DRAM is a component cannot satisfy

16   those factors.  In response, plaintiffs rely on numerous cases as part of a broad argument

17   that standing exists with respect to all the above mentioned states.

18   Preliminarily, the court must first resolve, as it did with respect to California's

19   antitrust statute, whether antitrust standing under the laws of all thirteen states at issue

20   must be determined with reference to the AGC factors.  The issue is whether the thirteen

21   states themselves would support application of the AGC test in assessing antitrust

22   standing.

23   With respect to eight of the thirteen states, the court finds that they would.  As

24   defendants point out, state courts in each of these eight states have concluded not only

25

26   _____

      [6]    Plaintiffs' fourth claim for relief also re-states a claim under California's antitrust
27   statute, the Cartwright Act, which defendants have targeted on this motion.  See Complaint,
      ¶ 97.  Since standing under California's Cartwright Act has already been discussed in
28   connection with plaintiffs' second claim for relief, however, the court omits discussion of that
      statute here.

that antitrust standing is distinct from the issue of indirect purchaser standing, but that

application of the AGC factors is a proper means of determining antitrust standing.  See

Wrobel v. A Very Dennison Corp., et al., No. 05-CV-1296 (Ks. Dist. Ct., Feb. 1

2006)(**Kansas**)("the Court finds that this AGC standing test may be applied to this action

even though the [Kansas Restraint of Trade Act] specifically contemplates indirect

purchaser suits"); Orr v. Beamon, 77 F. Supp. 2d 1208, 1212 (D. Kan.

1999)(**Kansas**)(federal district court in Kansas concluded "that standing under the Kansas

antitrust statutes requires an antitrust injury similar to that required under the Sherman and

Clayton Acts"); Knowles v. Visa U.S.A., Inc., 2004 WL 2475284, *5 (Me. Super. Ct.

2004)(**Maine**)("It is probable that the Maine Law Court, if presented with this issue, would

look to the [AGC] factors in determining standing under Maine's antitrust laws and would

apply those factors except to the extent that those factors cannot be reconciled with the

legislature's adoption of the Illinois Brick repealer"); Stark v. Visa U.S.A., Inc., 2004 WL

1879003, **2-3 (Mich. Cir. Ct. 2004)(**Michigan**)(applying AGC factors to determine antitrust

standing under Michigan antitrust statute); Gutzwiller v. Visa U.S.A., Inc., 2004 WL

2114991, *6 (Minn. Dist. Ct. 2004)(**Minnesota**)("Utilizing factors (1), (4) and (5) of the

[AGC] case in assessing the issue of standing [under Minnesota antitrust statute], is

consistent with the concerns addressed by the state legislators who debated the 1984

amendment prior to its passage, and consistent with federal law"); Crouch v. Crompton,

2004 WL 2414027, * 18 (N.C. Superior Ct. 2004)(**North Carolina**)("North Carolina courts

would apply a multi-factor test to determine standing in indirect purchaser cases. The

requirements would recognize indirect purchaser standing, but engraft upon the statute the

requirements of standing enunciated in AGC, modified to recognize the right to recover for

injury created by statute for indirect purchasers"); Beckler v. Visa U.S.A., Inc., 2004 WL

2115144, **2-3 (N.D. Dist. 2004)(**North Dakota**)(finding indirect purchaser claims too

remote and implying reliance on AGC factors in determining lack of standing); Cornelison v.

Visa U.S.A., Inc., No. CIV 03-1350 (S.D. Cir. Ct. 2004), Ex. A to Defendants' Motion for

**United States District Court**

For the Northern District of California

Judgment on the Pleadings re Second and Fourth Claims for Relief[7] (**South Dakota**)(hearing transcript noting state trial court's bench ruling employing AGC factors and granting dismissal based on lack of antitrust standing); <u>Strang v. Visa</u>, 2005 WL 1403769, *3 (Wis. Cir. Ct. 2005)(**Wisconsin**)("our appellate courts would look to [<u>AGC</u>] factors for guidance in assessing an indirect or remote purchaser's standing").[8]

The court finds these authorities persuasive, and has relied on them as helpful guidance in concluding that application of the <u>AGC</u> factors to the instant case is appropriate. While the cases do not emanate from the states' highest courts, they *do* emanate from courts with jurisdictional authority over the individual states in question, which courts are called upon to interpret the individual state laws at issue with more frequency and regularity than this court. Moreover, plaintiffs have failed to come forward with any contrary authority from the states in question. As such, the court concludes that plaintiffs' antitrust standing under the antitrust statutes of Kansas, Maine, Michigan, Minnesota, North Carolina, North Dakota, South Dakota, and Wisconsin, is to be determined with reference to the <u>AGC</u> factors.

As for the remaining five states – Arizona, Mississippi, Nebraska, Nevada and New Mexico – the court's analysis is different, as the court is unaware of any case law from these states that specifically considers and determines whether the <u>AGC</u> antitrust standing factors generally apply. However, as defendants point out, almost all of these states have harmonization provisions contained within their antitrust statutes calling for the statutes to be construed in accordance with federal law. <u>See, e.g.</u>, Ariz. Rev. Stat. Ann. § 44-1412 ("in construing this article, the courts may use as a guide interpretations given by the federal

---

[7]    Plaintiffs do not appear to have objected to defendants' submission of this material.

[8]    Many of the cases included in the preceding string cite were included as part of plaintiffs' lodging of relevant opinions, which occurred after briefing on the instant motions was complete, but before the hearing. Similarly, after the hearing, defendants also filed an application for leave to lodge a recent opinion, which the court granted on April 18, 2007. To the extent that many of the cases – and others included in plaintiffs' accompanying requests for judicial notice – are unpublished and/or not included in any electronic database, the court has considered the cases only to the extent relevant on an issue directly before the court.

courts to comparable federal antitrust statutes"); Neb. Rev. Stat. § 59-829 ("the courts of this state in construing [Nebraska's antitrust statute] shall follow the construction given to the federal law by the federal courts"); Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes"); N.M. Stat. Ann. § 57-1-15 ("the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws").  While Mississippi is the sole state without a harmonization provision, its Supreme Court has previously looked to federal law in interpreting the state's antitrust statute.  See, e.g., Harrah's Vicksburg Corp. v. Pennebaker, 812 So.2d 163 (Miss. 2002)(relying on federal interpretation of Noerr-Pennington doctrine to determine applicability of same under state antitrust statute). Collectively, this suggests, and the court concludes, that the antitrust statutes of these five states are to be applied with federal antitrust principles in mind.  As such, and looking to those federal principles insofar as antitrust standing is concerned, the court furthermore concludes that application of the AGC multi-factor test is appropriate in determining plaintiffs' antitrust standing under the antitrust statutes of Arizona, Mississippi, Nebraska, Nevada and New Mexico.  Once again, this conclusion is further buttressed by the fact that plaintiffs offer no relevant state legal authority holding directly to the contrary.

In sum, then, taking all the above into account, and consistent with the discussion set forth above in connection with the Cartwright Act claim, the court finds that, even though the thirteen states at issue allow for indirect purchaser standing, plaintiffs here must still satisfy the general antitrust standing requirements with reference to the multi-factor test set forth in AGC.  Application of this multi-factor test, naturally, shall be applied in a fashion that takes into account the broader standing principles that each state adheres to with respect to indirect purchasers.

Having concluded that antitrust standing requirements as set forth in AGC should apply, the question before the court is now whether a consideration of those factors demonstrates that the indirect purchaser plaintiffs at issue have adequately alleged antitrust standing.

With respect to this question, the parties' arguments are identical to those made in connection with the court's discussion of antitrust standing under the Cartwright Act, <u>supra</u>. Accordingly, the court's analysis of these factors is the same.  For the same reasons, therefore, that the court found antitrust standing to be lacking pursuant to the Cartwright Act claim, the court also finds that antitrust standing is lacking with respect to the thirteen remaining state law claims, for those plaintiffs with claims based on purchases of products in which DRAM is a component.

As such, the court similarly GRANTS defendants' motion for judgment on the pleadings with respect to these particular claims brought under the thirteen state laws at issue.

b.    remaining five states

In addition to challenging the above claims under the thirteen state laws, defendants argue that with respect to five of the twenty-two states whose antitrust statutes are invoked in plaintiffs' fourth claim for relief – Ohio, West Virginia, Alabama, South Dakota, and Pennsylvania – plaintiffs lack antitrust standing as a matter of law, for reasons in addition to failure to adequately satisfy the <u>AGC</u> factors.  Defendants' arguments here, unlike those made heretofore, do not appear to be limited only to those plaintiffs with claims based on purchases of products in which DRAM is a component.  Rather, defendants appear to argue that *all* plaintiffs lack antitrust standing to bring their claims under the five state laws discussed below, as a matter of law.

1.    Ohio and West Virginia

Defendants contend that both Ohio and West Virginia have laws that prohibit indirect purchaser standing for private actions.  With respect to Ohio's Valentine Act, defendants argue that the Ohio Supreme Court expressly held as much in <u>Johnson v. Microsoft Corp.</u>, 834 N.E. 2d 791 (Ohio 2005), and that decision should control here.  With respect to West Virginia, defendants assert that its antitrust statute contains a harmonization provision, which West Virginia state courts have construed as requiring them to "apply the federal decisional law interpreting the Sherman Act to [West Virginia's] own parallel anti-trust

23

statute." <u>Gray v. Marshall County Bd. of Educ.</u>, 367 S.E. 2d 751, 755 (W. Va. 1988). According to defendants, this mandates that the court apply <u>Illinois Brick</u>'s prohibitions to West Virginia law, and prohibit the indirect purchasers from bringing suit here.

With respect to Ohio's antitrust statute, defendants are correct. The Ohio Supreme Court has expressly stated that it "adopt[s] and follow[s] <u>Illinois Brick</u>'s direct-purchaser requirement and hold[s] that an indirect purchaser of goods may not assert a Valentine Act claim for alleged violations of Ohio antitrust law". <u>Johnson</u>, 834 N.E. 2d at 798. Plaintiffs, for their part, "concur" that Ohio's Valentine Act has been construed "not to afford a cause of action to indirect purchasers...". <u>See</u> Pl. Opp. Br. Re Second and Fourth Claims for Relief, at 20:8-10. While they profess that they may nonetheless sue under Ohio common law, as alleged in a separate related action currently before the court brought by various state attorneys general, the court does not address that complaint by way of the instant order, and plaintiffs arguments in this regard are therefore irrelevant. Accordingly, in view of the Ohio Supreme Court's express holding in <u>Johnson</u>, and plaintiffs' recognition and concession regarding that holding, the court finds that the indirect purchaser plaintiffs' claim pursuant to the Ohio Valentine Act is barred as a matter of law. The court hereby GRANTS judgment on the pleadings with respect to this claim.

This leaves West Virginia for consideration. Generally speaking, defendants are correct that federal decisional law interpreting the Sherman Act is to be applied in interpreting West Virginia's parallel antitrust statute. <u>See</u> W. Va. Code § 47-18-16; <u>Gray</u>, 367 S.E. 2d 751. However, while this would seem to suggest that the <u>Illinois Brick</u> doctrine also extends to indirect purchaser actions brought under West Virginia's state antitrust statute, this conclusion is called into question by the fact that the West Virginia attorney general has promulgated a legislative rule expressly *permitting* antitrust suits brought by indirect purchasers. The attorney general's ability to promulgate such a rule is contemplated by the state's antitrust statute itself, which explicitly grants the state attorney general the right to adopt rules and regulations interpreting and enforcing West Virginia's antitrust statute. <u>See</u> W. Va. Code § 47-18-20 ("[t]he attorney general may make and

24

**United States District Court**
For the Northern District of California

1  adopt such rules and regulations as may be necessary for the enforcement and

2  administration of [the statute]").

3    Moreover, as plaintiffs point out, at least two federal courts have found that the West

4  Virginia legislative rule allowing indirect purchaser standing is valid, and should be given

5  effect.  See In re New Motor Vehicles, 350 F. Supp. 2d 160, 173-75 (D. Me 2004); In re

6  Terazosin Hydrochloride Antitrust Litigation, 160 F.Supp.2d 1365, 1376, n.8 (S.D. Fla.

7  2001).  While neither case emanates from a court with jurisdictional authority over West

8  Virginia, they are nonetheless instructive.  In re New Motor Vehicles is particularly helpful.

9  The federal court there dealt with the precise issue now before the court – i.e., whether

10 indirect purchaser standing is granted under West Virginia law, in the face of apparent

11 conflict between the state attorney general's rule, and the harmonization provision of the

12 state antitrust statute.  After engaging in a fairly comprehensive overview of West Virginia

13 rules of statutory interpretation and the relevant legislative history, the In re New Motor

14 Vehicles court concluded that, since the harmonization provision at issue did not speak to

15 indirect purchaser standing specifically, but was more broadly worded to provide for a

16 "liberal" general interpretive approach, the state attorney general's subsequent rule

17 interpreting the statute to allow for indirect purchaser standing was a "permissible" reading

18 of the statute, and entitled to deference.  See id.

19   The court applies that reasoning here.  Moreover, unless and until this issue is

20 raised and resolved by West Virginia state courts, the West Virginia attorney general – who

21 is expressly granted the authority to interpret the very antitrust statute at issue here – is

22 entitled to some deference.

23   Accordingly, the court finds that the indirect purchaser plaintiffs' claim pursuant to

24 West Virginia's state antitrust statute is not barred by incorporation of the Illinois Brick

25 doctrine, and defendants' motion for judgment on the pleadings with respect to plaintiffs'

26 claim under West Virginia law is hereby DENIED.

27     2.  Alabama

28   Defendants contend that plaintiffs' state antitrust claim under Alabama's Unfair

Trade Practices Act ("UTPA") is barred by the statute of limitations, since (1) the statute of limitations required plaintiffs to file their UTPA claim within two years of the 2002 time frame in which plaintiffs allege they discovered defendants' violations, and (2) plaintiffs filed their complaint in 2005, well more than two years after plaintiffs concede that they knew of their potential claims. Defendants argue, in the alternative, that plaintiffs' claim is barred because the UTPA applies solely to intrastate activities, which are not properly alleged here.

In response, plaintiffs do not dispute the timing discrepancy highlighted by defendants but argue that, under the doctrine of class tolling, the statute of limitations was tolled by the filing of prior class actions in California state court in 2002 and 2003, both of which were filed on behalf of a nationwide class that included Alabama residents. With respect to defendants' alternative argument, plaintiffs contend that the complaint may reasonably be inferred to state anticompetitive effects on both interstate and intrastate commerce.

The parties' arguments regarding the timeliness of plaintiffs' UTPA claim overlap with those raised by the parties in conjunction with defendants' motion for judgment on the pleadings as to plaintiffs' fifth cause of action, and are discussed in detail below. While the court will not repeat that analysis here, it holds that for the same reasons as those highlighted below, and consistent with the court's decision therein, the doctrine of class tolling does not apply to plaintiffs' antitrust claim under the UTPA. As such, the court finds that plaintiffs' antitrust claim pursuant to the UTPA is barred by the two-year statute of limitations, and defendants' motion for judgment on the pleadings with respect to this claim is therefore GRANTED.

In view of this holding, it is unnecessary for the court to consider whether the UTPA applies to intrastate activity.

3.    South Dakota

Defendants assert that plaintiffs cannot bring their claim under South Dakota's antitrust statute because the statute requires an allegation that the alleged conduct affected

United States District Court

For the Northern District of California

"trade or commerce wholly within the state," an allegation that plaintiffs do not and cannot make. Plaintiffs, in response, argue that defendants are relying on an older version of the statute, and that the current statute applies to any conspiracy "in restraint of trade or commerce *any part of which is within this state*," which means that the statute applies to any interstate conduct, so long as it has an intrastate component as well. And since plaintiffs allege a national conspiracy here, they argue that allegations as to this national conspiracy presume the requisite effects within the state of South Dakota.

Turning first to the language of the statute itself, the court agrees with plaintiffs that South Dakota's antitrust statute should be read to cover unlawful anticompetitive conduct, as long as any part of it "is within [South Dakota]" – i.e., as long as any part of it takes place or has an effect within the state. See S.D. Codified Laws § 37-1-3.1 ("A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful"). This reading is supported by the literal language of the statute, and defendants have submitted no South Dakota case law that holds differently. Indeed, neither party has submitted any relevant South Dakota case law interpreting this provision of the statute. To be sure, defendants' differing view that the statute reaches conduct that is "wholly within the state" – and therefore, exclusively within the state – is premised upon South Dakota case law. However, that case law predates the current version of the antitrust statute. See State v. Fullerton Lumber, 152 N.W. 708, 712 (S.D. 1915). And while defendants are correct that no case relied on by plaintiffs – nor any case unearthed by the court – expressly overrules Fullerton Lumber, that case was nonetheless issued more than sixty years prior to 1977, the year in which South Dakota's antitrust statute was amended to state, as it does currently, that the statute covers unlawful conspiracies to restrain trade or commerce as long as any part of it is "within the state." See, e.g., S.D. Codified Laws §§ 37-1-1 to 37-1-3 (repealed in 1977).

As such, and since no South Dakota case has been cited or discovered that interprets the current language of the statute, or more particularly, its effect on the type of interstate/intrastate conduct that a plaintiff is required to allege, the current operative

27

United States District Court

For the Northern District of California

language of the statute controls. Plaintiffs are therefore able to state a claim under the statute as long as they allege an unlawful conspiracy to restrain trade or commerce, any part of which is within the state of South Dakota.

The court notes, however, that plaintiffs complaint does not specifically allege any conduct or conspiracy that takes place, or has any effect within South Dakota. At most, plaintiffs have alleged only that defendants' activities had "a substantial effect on the foreign and interstate commerce of the United States." See Complaint, ¶ 4. This is insufficient, in the court's view, to allege the requisite activity or effects within the state of South Dakota that the statute requires.

Accordingly, for this reason, the court GRANTS defendants' motion for judgment on the pleadings with respect to plaintiffs' claim pursuant to South Dakota's antitrust statute. In view of the fact that judgment is being granted with respect to a technical pleading deficiency that might be cured by amendment, however, the court also grants plaintiffs leave to amend their complaint in order to cure the above pleading deficiency.

The court notes that leave to amend is granted only with respect to those plaintiffs who do not have claims under this statute based on purchases of products in which DRAM is a component. For as discussed above, plaintiffs who have purchased products in which DRAM is a component cannot assert claims based on those purchases under South Dakota's antitrust statute, as they lack antitrust standing. In view of this fundamental deficiency, therefore, any amendment here would be futile.

4.    Pennsylvania

Plaintiffs bring a claim for unlawful "restraint of trade" in violation of "the Pennsylvania common law." See Complaint, ¶ 111. Defendants argue, however, that Pennsylvania does not recognize either statutory or common law actions for restraint of trade. Plaintiffs, in response, assert that there are "conflicting authorities" on this point, and that certain "pronouncements" from both the state's highest court and several federal courts suggest that a remedy is, indeed, available under Pennsylvania common law.

Defendants' arguments are more persuasive. They have relied on two separate

28

state court opinions, in which the courts expressly stated that neither statutory nor common law actions exist in Pennsylvania for claims seeking money damages for antitrust violations. See, e.g., XF Enterprises v. BASF Corp., 47 Pa. D & C 4th 147, 150-51 (Pa. Comm. Pl. 2000)("No court to date has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations"); Stutzle v. Rhonepoulenc S.A., 2003 WL 22250424, *2 (Pa. Comm. Pl. 2003)(same). As these cases noted, no state court has ever held to the contrary, nor has the state legislature provided residents of Pennsylvania with a private right of action authorizing a suit for damages.

Plaintiffs rely on contrary state authorities for support in arguing that Pennsylvania has recognized common law actions for antitrust violations in the past. See, e.g., Schwartz v. Laundry & Linen Supply Driver's U., 14 A.2d 438, 440 (Pa. 1940); Collins v. Main Line Bd. Of Realtors, 304 A.2d 493, 498 (Pa. 1973). These authorities, however, are inapposite, and of limited relevance here. For none of these cases held that Pennsylvania common law supports a cause of action for antitrust damages. To the extent that the cases discussed the availability of a common law cause of action, they dealt specifically with injunctive, or equitable relief. Moreover, and as the XF Enterprises court pointed out when it considered the Collins case, the language in that opinion, and upon which plaintiffs rely, "is dicta and is ambiguous at best." See XF Entperprises, 47 Pa. D & C 4th 147 at 150.

In light of the fact that no Pennsylvania state court has ever affirmatively held that a common law cause of action for antitrust damages may lie, and furthermore in light of the existence of cases based on state law expressly stating that no such cause of action may lie, the court declines plaintiffs' invitation to hold that such an action is permissible. To that end, the court hereby GRANTS defendants' motion for judgment on the pleadings with respect to plaintiffs' claim, based solely on Pennsylvania common law.

**III.    Motion for Judgment on the Pleadings re Fifth Claim for Relief**

Defendants' second motion seeks judgment on the pleadings with respect to plaintiffs' fifth claim for relief. Like defendants' fourth claim for relief, the fifth claim also alleges the violation of twenty-two different state statutes, but whereas defendants' fourth

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

claim alleged violations of state antitrust statutes, defendants' fifth claim alleges violations of consumer protection and unfair competition statutes.  Of the twenty-two consumer protection statutes at issue, defendants challenge only thirteen, arguing that they do not as a matter of law provide a vehicle for bringing plaintiffs' antitrust claims.  See Complaint, ¶¶ 118-142.  The thirteen states whose statutes are challenged are:  Alaska, Arkansas, Hawaii, Idaho, Louisiana, Montana, New York, Oregon, Rhode Island, South Carolina, Utah, West Virginia, and Wyoming.

Specifically, defendants assert that four grounds, either separately or in combination, support dismissal of plaintiffs' claims under the thirteen state laws at issue:  (1) the statutory claims are barred by applicable statutes of limitations; (2) the statutes contain limitations that prohibit class actions; (3) plaintiffs should not be allowed to circumvent separate state antitrust laws that prohibit indirect purchaser standing; and/or (4) the statutes do not apply to the allegations in the instant case.

The court addresses defendants' first two grounds individually.  However, because the latter two grounds go to the actual substance of plaintiffs' claims under the individual statutes, the court will address the latter two grounds together, in a state by state analysis.

1.    Statutes of Limitations

Defendants contend that claims brought pursuant to the consumer protection and unfair protection statutes of seven states are barred pursuant to the relevant statutes of limitations applicable in those states.  Specifically, defendants point out that both Louisiana and Oregon have a one year statute of limitations applicable to claims brought under their consumer protection and unfair competition laws, while Alaska, Idaho, Montana, Utah, and Wyoming all have two-year statutes of limitations.  Defendants then note that, while plaintiffs' complaint alleges that plaintiffs "did not discover, and could not have discovered" the alleged conspiracy in question "until shortly before class action litigation was commenced against the Defendants in 2002," the complaint itself was not filed until June 17, 2005.  See Complaint, ¶ 68.  Defendants argue that, since the complaint establishes 2002 as the general time frame during which plaintiffs became aware of their claims and

United States District Court

For the Northern District of California

from which the statute of limitations therefore began running on those claims, the claims brought under the laws of all seven states are accordingly barred.

Plaintiffs invoke the class tolling doctrine in response.[9]  They argue that, as of 2002, the various statutes of limitations on their claims have been tolled, by virtue of three related class actions filed in California state courts on behalf of plaintiff classes that include residents of the seven states at issue.  Those state class actions, which were filed in 2002 and 2003, remain pending, with no decision yet issued as to either certification or the merits.  Since those actions tolled the limitations period for all claims that could have been brought by any class member, and since plaintiffs in the instant case were part of those earlier classes, plaintiffs assert that their challenged claims here are timely.

The class tolling doctrine holds that the commencement of a class action stops the running of statutes of limitations as to all claims that might be asserted by all members of the class.  See Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974)("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."); see also Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983)(same).  The Supreme Court has held that the doctrine helps to safeguard the "principal purposes of the [Rule 23] class action procedure – promotion of efficiency and economy of litigation ...".  See Crown, Cork & Seal, 462 U.S. at 349.

The Ninth Circuit has had a few occasions on which to consider the class tolling doctrine.  In Tosti v. City of Los Angeles, for example, the Ninth Circuit applied class tolling to a plaintiff's subsequent individual action alleging sex discrimination – filed outside the limitations period – where the plaintiff had opted out of an earlier class action lawsuit

---

[9]      Plaintiffs also argue, in conclusory fashion, that "[w]here, as here, the timeliness of the claims depends on an examination of fact-intensive issues such as concealment, discovery and tolling, the issue cannot properly be resolved in a judgment on the pleadings." See Pl. Opp. Br. at 2:18-3:1.  Aside from this brief statement, however, plaintiffs make no showing as to why or how the issues of concealment, discovery, and/or tolling are fact-intensive as applied to this case, such that resolution of the statute of limitations issue – via 12(c) motion – is improper.  Accordingly, plaintiffs' argument in this regard is unpersuasive.

United States District Court

For the Northern District of California

involving the same allegations. <u>See</u> 754 F.2d 1485 (9th Cir. 1985).  The Ninth Circuit held that the doctrine applied, even though plaintiff's individual claims – alleging violations of the fourteenth amendment and 42 U.S.C. § 1983 – were slightly different than the prior class action claims, which alleged Title VII violations in addition to claims under section 1983 and the fourteenth amendment.  <u>See id</u>. at 1489 (finding "no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit").

Then, in <u>Robbin v. Fluor Corp</u>., the Ninth Circuit considered whether the pendency of an earlier class action tolled the applicable statutes of limitations for a subsequently filed <i>class</i> action, in addition to a subsequently filed individual action.  <u>See</u> 835 F.2d 213 (9th Cir. 1987).  The Ninth Circuit held that the class tolling doctrine did not apply to the subsequently filed class action (although it allowed the individual action to go forward).  Central to the court's ruling was the fact that the district court had denied class certification in the earlier class action, which denial the subsequent class action sought to re-litigate, and thereby circumvent.  The court reasoned that the policy considerations underlying the tolling doctrines of <u>American Pipe</u> and <u>Crown, Cork & Seal</u> did not support application of the class tolling doctrine in such circumstances.  <u>Id</u>. at 214.

The Ninth Circuit arrived at a different conclusion, however, in <u>Catholic Social Serv., Inc. v. INS</u>, 232 F.3d 1139 (9th Cir. 2000).  There, the court applied class action tolling and allowed a subsequent class action to go forward.  The court distinguished its decision from <u>Robbin</u> on grounds that plaintiffs in <u>Catholic Social Serv</u>., unlike the plaintiffs in <u>Robbin</u>, were not attempting to re-litigate an earlier denial of class certification.  <u>See</u> 232 F.3d at 1149.  Nor were they attempting to correct a procedural deficiency in an earlier would-be class, a factor that other, out-of-circuit authorities have relied on as a basis for refusal to apply class tolling.  <u>Id</u>.  While distinguishing the case before it from those other cases, however, the Ninth Circuit appeared to cite with approval the language employed by those other authorities – including the US Supreme Court – stating that plaintiffs may not "piggyback one class action onto another ... and thereby engage in endless rounds of

32

litigation...".  See id. at 1148.

As these cases demonstrate, the Ninth Circuit has thus far applied class tolling in situations where plaintiffs in the subsequently filed class action have opted out of an earlier certified class, or where plaintiffs are not seeking to circumvent an earlier denial of class certification, or to otherwise correct procedural deficiencies that formed the basis for such a denial.

The Ninth Circuit has never had occasion, however, to pass on the particular situation before the court here – i.e., where plaintiffs seek application of class tolling to a subsequently filed class action, where *no decision* as to certification has yet been made in the earlier filed class action.  Unsurprisingly, the parties disagree as to the import of the above cases on this issue, and rely on varying persuasive authority in pressing their arguments upon the court.

Plaintiffs, for example, read the Catholic Social Serv. holding, permitting class action tolling, expansively.  They read it as setting forth the proposition that, *unless* a decision on the merits or on class certification has issued in the earlier filed class action, class tolling applies.  They further invoke In re Linerboard, 223 F.R.D.335, 351 (E.D. Pa. 2004), for the proposition that application of class tolling is particularly appropriate in cross-jurisdictional class actions, such as those at issue here, since it prevents courts around the country from being flooded with substantially similar class actions "anytime a nationwide class action is filed."

Defendants, on the other hand, point to the policy reasons behind the class tolling doctrine and argue that these reasons counsel against applying class tolling to later-filed actions where no decision on certification or the merits has been reached in the earlier filed action.  They specifically rely on In re Heritage Bond Litig., 289 F. Supp. 2d 1132 (C.D. Cal. 2003), a district court case that considered the identical issue before the court here, and which declined to apply class tolling.  The In re Heritage Bond court noted that the class tolling doctrine as originally set forth in American Pipe, promotes judicial efficiency: for if tolling were withheld for subsequently filed claims, putative class members would be forced

United States District Court
For the Northern District of California

to prematurely file their own actions prior to a determination on certification in the earlier class action, in order to preserve their claims – 'precisely the multiplicity of activity which Rule 23 was designed to avoid...". See In re Heritage Bond, 289 F. Supp. 2d at 1150. The In re Heritage Bond court then went on to reason that, in view of these policy considerations, the doctrine "does not apply to individuals who would not be parties to the earlier filed class action if it continued as a class action." Id. Indeed, the class tolling doctrine, continued the court, "was never intended to apply to plaintiffs 'who file separate suits prior to a decision being reached on the class certification issue,' because none of the judicial efficiency purposes of the doctrine [would be] served by applying it to plaintiffs who voluntarily pursue their individual claims even before the court determines whether the class is viable...". See id. As such, the court held that class action tolling did *not* apply to a subsequent class action filed prior to a certification decision in the earlier filed action. Id.

While the issue is far from clear cut, the court is nonetheless persuaded that class tolling should not be applied to plaintiffs' state law claims here. Both the Ninth Circuit's reasoning in Catholic Social Serv., which appears to cite with approval other courts' concerns for the potential multiplicity of actions that could result from allowing subsequent classes of plaintiffs to unfairly "piggyback" on prior class actions, and the court's own view that the policy reasons behind the class tolling doctrine are better served by declining to apply class tolling under the facts of this case, urge this result. The court is particularly concerned, for example, that if it were to conclude otherwise, and class tolling were held to apply, then plaintiffs would essentially be permitted to file class action after class action, until the state court class actions finally decide either the merits of the earlier cases, or the class certification issue.

For these reasons, the court declines to apply the class tolling doctrine to plaintiffs' claims brought under the seven state statutes at issue. Accordingly, since no tolling applies, defendants' motion for judgment on the pleadings with respect to plaintiffs' claims under the laws of Alaska, Idaho, Louisiana, Montana, Oregon, Utah, and Wyoming, as stated in plaintiffs' fifth claim for relief, is hereby GRANTED.

**United States District Court**

For the Northern District of California

2.      State Limitations on Class Actions

Defendants also contend that the consumer protection statutes of Louisiana, Montana, New York, and South Carolina, all prohibit plaintiffs from bringing a class action suit, and require dismissal of plaintiffs' claims under those statutes.  Defendants' arguments with respect to Louisiana, Montana, and South Carolina are similar, while they make a separate argument with respect to New York.  The court therefore groups its discussion of these states accordingly.

a.      Louisiana, Montana, South Carolina

With respect to these states, defendants make two general arguments.  First, they point out that their consumer protection statutes expressly prohibit representative actions for damages, such as the one filed by plaintiffs here.  Second, defendants note that plaintiffs also have no individual claims under any of the state statutes at issue that could support any representative claims – no plaintiff is a resident of any of the three states in question, nor do plaintiffs allege that they have bought any affected goods in the relevant states.  Accordingly, defendants argue that plaintiffs' claims under those statutes are not viable.

Defendants are correct.  First, as they point out, the statutes cannot be enforced by way of a class action suit.  The clear language of all three statutes expressly states as much.  See La. Rev. Stat. § 51:1409(A)(plaintiffs "may bring an action individually but not in a representative capacity to recover actual damages" under statute"); Morris v. Sears, Roebuck & Co., 765 So. 2d 419, 421 (4th Cir. 2000)(Louisiana statute "expressly prohibits a private class action"); Mont. Code Ann. § 30-14-133(1)(consumers "may bring an individual but not a class action"); S.C. Code Ann. § 39-5-140(persons bringing suit under statute "may bring an action individually, but not in a representative capacity, to recover actual damages").  Moreover, other federal courts have also read the express language of the statutes in question to prohibit class actions.  See, e.g., Hamilton v. United Healthcare of La., 310 F.3d 385, 393 (5th Cir. 2002)(district court "[c]onclud[ed], correctly, that the [Louisiana consumer protection statute] does not allow class action claims"); In re Pharm.

35

United States District Court

For the Northern District of California

Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 84 (D. Mass. 2005)(stating that under Louisiana and Montana law, "there is no right to bring a class action to enforce the consumer protection statutes"); Gunnells v. Healthplan Servs., 348 F.3d 417, 423 (4th Cir. 2003)(impliedly affirming district court's refusal to certify class under South Carolina consumer protection statute in statutory prohibition on representative actions to recover monetary damages).

Plaintiffs attempt to avoid the above conclusion by arguing that the statutory limitations set forth in each of the three statutes constitute across-the-board limits on class adjudication that are inconsistent with Rule 23, and must therefore be disregarded. Plaintiffs rely specifically on three out of circuit district court cases for support of their argument. See O'Keefe v. Mercedes-Benz, USA, LLC, 214 F.R.D. 266, 285-86 (E.D. Pa. 2003); In re Bridgestone/Firestone Inc., 205 F.R.D. 503, 514-15 (S.D. Ind. 2001), rev'd in part on other grounds, 288 F.3d 1012 (7th Cir. 2002); Kristiansen v. John Mullins & Sons, Inc., 59 F.R.D. 99, 109-110, n. 113 (E.D. N.Y. 1973).  As defendants point out, however, none of these cases actually addresses the three specific state statutes in question, or otherwise provides a basis for refusing to follow both the express statutory language contained therein prohibiting private class actions for monetary damages, and decisional authority from relevant jurisdictions confirming this interpretation.  As such, plaintiffs' representative claims under these three statutes fail.

Second, and significantly, defendants are also correct that plaintiffs have not, in the first instance, laid the proper groundwork for a representative claim.  No named plaintiff is a resident of any of the three states in question, nor is there any allegation of any conduct or activity taking place within the targeted states that sets forth a basis for connecting plaintiffs' individual claims with representative claims under Louisiana, Montana, or South Carolina statutes.  Plaintiffs, for their part, fail to argue otherwise, thereby conceding the issue.

In sum, and for the above reasons, the court concludes that defendants' motion for judgment on the pleadings as to plaintiffs' representative claims under the consumer

protection statutes of Louisiana, Montana, and South Carolina must be, and are hereby is, GRANTED, as the statutes prohibit private class action suits for money damages, and plaintiffs have furthermore failed to set forth any allegations allowing such representative claims to go forward.

              b.     New York

Defendants also target plaintiffs' claim pursuant to New York's consumer protection statute, General Business Law § 349 et seq.  Specifically, they argue that a separate state statute – New York C.P.L.R. § 901(b) – prohibits plaintiffs' representative claim under General Business Law § 349.  Section 901(b) prohibits any class action "to recover a penalty, or a minimum measure of recovery created or imposed by statute."  Defendants assert that this prohibition extends to plaintiffs' claim under section 349, since that statute permits plaintiffs to seek "actual damages or fifty dollars, whichever is greater," as well as treble damages for willful violations.  See N.Y. Gen. Bus. Law § 349(h).  According to defendants, plaintiffs' claim under section 349 therefore improperly seeks recovery of a "penalty" by way of a representative claim, and must be dismissed.

In response, plaintiffs argue that they do not seek treble damages or penalties under section 349, but only actual damages, thereby making C.P.L.R. § 901(b) inapplicable.  Plaintiffs further noted at the hearing that the complaint expressly requests that relief in the form of damages be awarded only "as provided by federal and state antitrust laws...".  See Complaint, at 28:7-9.  As such, plaintiffs contend that they are only seeking those damages that are permissible under any given state's laws.

Plaintiffs' arguments are more persuasive.  As the controlling state cases they rely on hold, section 901(b) only proscribes class actions that seek to recover either statutory penalties, or statutory minimum damage awards; it does not proscribe class actions that seek recovery of actual damages.  See, e.g., Cox v. Microsoft Corp., 778 N.Y.S. 2d 147, 148-49 (N.Y. App. Div. 1st Dep't 2004)(rejecting defendant's argument that plaintiffs were not entitled to class action relief under § 349 based on fact that statutorily prescribed $50 minimum damages constitutes a "penalty" under C.P.L.R. 901(b)); Super Glue Corp. v.

37

United States District Court

For the Northern District of California

Avis Rent a Car Sys., Inc., 517 N.Y.S. 2d 764, 767 (N.Y. App. Div. 2nd Dep't 1987)("a class action may be maintained to recover actual damages and injunctive relief pursuant to [section] 349(h)").  These cases are directly on point, since they considered the very same issue before the court here – i.e., whether C.P.L.R. § 901(b) prohibits class action claims brought under Gen. Bus. Law § 349.  Furthermore, the court is compelled to defer to the New York state courts' interpretation of their own state law.  Accordingly, the court concludes that there is no bar to plaintiffs' class action claim under section 349, provided that plaintiffs are seeking only actual damages.

On this point, the court is persuaded that plaintiffs' complaint does indeed set forth a claim for actual damages only.  For, as plaintiffs pointed out at the hearing on the instant motions, the complaint's prayer for relief seeks damages only "as provided by federal and state antitrust laws."  See Complaint at 28:7-9.  Although defendants respond by stating that this allegation is contradicted by a subsequent allegation of the complaint, which states that plaintiffs are seeking judgment "in an amount to be trebled in accordance with such laws," the court does not believe that this allegation undermines plaintiffs' argument.  For it still remains true, as alleged, that plaintiffs are limited to seeking judgment "in accordance with" the laws pursuant to which they seek relief.  And, as just explained above, the statute pursuant to which plaintiffs seeks relief via a representative claim allows for only actual damages.

In sum, and for all these reasons, the court concludes (1) that C.P.L.R. § 901(b) presents no bar to class action suits seeking actual damages pursuant to Gen. Bus. Law § 349; and (2) that plaintiffs' complaint sufficiently alleges that plaintiffs are seeking actual damages only under section 349, in accordance with New York law.  Accordingly, the court DENIES defendants' motion for judgment on the pleadings in connection with plaintiffs' representative claim pursuant to New York's Gen. Bus. Law § 349.  Plaintiffs' claim under

the statute remains valid.[10]

3.    Substantive State by State Analysis

Defendants' remaining arguments are targeted at the consumer protection statutes of eleven states: Alaska, Arkansas, Hawaii, Idaho, Montana, New York, Oregon, Rhode Island, Utah, West Virginia, and Wyoming. Defendants urge the court to dismiss plaintiffs' claims brought pursuant to these statutes on two grounds. First, that plaintiffs' indirect purchaser claims under these state statutes are improper, because each state specifically prohibits or limits – whether by operation of separate statute or other laws – indirect purchasers from bringing antitrust suits, pursuant to Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). According to defendants, since these states follow Illinois Brick's general prohibition on indirect purchaser suits alleging antitrust violations, allowing plaintiffs to seek the same relief by way of consumer protection statutes would be improper. Second, and in a closely related argument, defendants assert that plaintiffs' consumer protection claims are improper because the consumer protection statutes pursuant to which the claims are brought are truly intended to cover allegations of false advertising, and deceptive or fraudulent conduct – i.e., classic consumer protection violations – and do not cover plaintiffs' antitrust allegations.

In essence, the gist of defendants' arguments with respect to the substance of the consumer protection claims at issue here, is simply that the statutes pursuant to which plaintiffs bring their claims are aimed solely at true consumer protection violations actually suffered by injured parties – i.e., they are not meant to cover, and cannot be interpreted to cover, antitrust violations brought by indirect purchasers of goods.

---

[10]    The court notes that there is a larger potential problem suggested by plaintiffs' complaint, which the parties have not addressed. Notwithstanding their arguments regarding the fact that plaintiffs are only seeking damages that are consistent with "federal and state antitrust laws," plaintiffs have not actually alleged that they are seeking any damages pursuant to any of the consumer protection statutes alleged in the complaint. See Complaint, Prayer for Relief at 28:27:19-28:27. Accordingly, and based on their failure to allege as such, there is an argument to be made that plaintiffs are unable to recover any damages pursuant to the consumer protection statutes alleged in their complaint, in the event those statutes provide for damages. Since the parties have not raised this argument, however, the court refrains from making a final determination as to this issue.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Preliminarily, the court notes that defendants' arguments touch upon areas of law that are unsettled in the majority of the states at issue. While the court has attempted, for example, to construe the individual state statutes at issue with reference to the actual state courts' interpretation of their own law state laws, the court has not always found case law that is both directly on point and which constitutes controlling legal authority within the given state in question, as discussed more thoroughly below. For that reason, the court has construed the statutes in question with reference to certain overriding principles. First, where possible, the court has relied on controlling state law cases. Second, and where no controlling state law cases are available, the court has looked to state legislative history – where available and relied on by the parties – as persuasive authority regarding proper statutory interpretation. In the event neither of these preceding sources proved helpful, the court has looked to other, persuasive jurisdictions that interpret the specific statute in question.

Moreover, and particularly with respect to the issue whether indirect purchaser standing exists under the consumer protection statutes in question, where there is no state law authority regarding the issue, the court's approach to statutory interpretation is conservative in nature. Where possible, the court has avoided making affirmative pronouncements regarding state law that would have the effect of substantially broadening the legal rights available pursuant to that law.

With these guidelines in mind, the court turns to each individual state at issue, and evaluates the arguments with respect to each, as follows.

a.    Alaska

Plaintiffs assert a representative claim pursuant to Alaska's Unfair Trade Practices and Consumer Protection Act ("AUTPCPA"). See Alaska Stat. § 45.50.531. Defendants argue that, since Alaska's antitrust statute expressly prohibits indirect purchasers from bringing private suits for antitrust violations and limits such actions to those brought by only the state attorney general, plaintiffs should not be allowed to circumvent that prohibition by proceeding under the AUTPCPA. In response, plaintiffs argue that the AUTPCPA applies

United States District Court

For the Northern District of California

broadly to any "persons" who have been injured, regardless whether they are indirect or direct purchasers, and that the Alaska Supreme Court has previously held that private parties may sue under AUTPCPA for conduct that also violates Alaska's antitrust statute – as is the case here. Plaintiffs also assert that the AUTPCPA was modeled after the Federal Trade Commission Act ("FTCA"), which has been held to apply to antitrust violations, and that both state and federal courts have consistently granted indirect purchaser standing where those indirect purchasers bring suit under statutes that are modeled after the FTCA.

The AUTPCPA provides: "A person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful [under AUTPCPA] may bring a civil action to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater." See Alaska St. § 45.50.531. There is nothing in the statute's wording or definitions, however, that specifically defines either direct or indirect purchasers as "persons," or that distinguishes between the two. Nor is there any guidance provided by the language of the statute as to whether, more generally, indirect purchaser standing in the antitrust context suffices under the AUTPCPA. Furthermore, neither party has submitted any controlling case authority – or, for that matter, any persuasive case authority – directly on point as to this issue. Defendants merely assert that the absence of any case law expressly allowing indirect purchasers to sue under the AUTPCPA requires the conclusion that no indirect purchaser standing exists under it, while plaintiffs assert that the absence of any case law disallowing indirect purchasers to sue requires the conclusion that such standing does exist.

Recognizing the absence of authority that is directly on point, the parties extrapolate from non-controlling authority to support their positions. Defendants rely on Alaska's amended antitrust statute, for example, to establish that prior to July 2003, indirect purchaser suits alleging antitrust violations were flatly prohibited. See Alaska Statute § 45.50.577 (amended to state that, after July 2003, "only the attorney general" may sue under the antitrust statute on behalf of violations alleged by indirect purchasers). Based on

41

the statute's amendment permitting the attorney general to sue after July 2003, defendants reason that permitting indirect purchaser claims under the AUTPCPA would frustrate the purpose and goals of the state legislature as set forth in the amended state antitrust statute. Plaintiffs, by contrast, rely on legislative history that expresses no opinion about indirect purchaser standing, and the Supreme Court's decision in Odom v. Fairbanks Mem. Hosp., 999 P.2d 123, 131-32 (Alaska 2000), a controlling state court case in which the court held that certain conduct may give rise to violations under both Alaska's state antitrust statutes and the AUTPCPA, but made no pronouncement on the issue of indirect purchaser standing.

None of these authorities is obviously directly on point. As such, and furthermore recognizing that this court is not in the best position to decide unresolved legal issues for the state of Alaska, the court chooses to adopt the interpretation that will wreak the least amount of havoc on the existing law in Alaska. To that end, the court therefore declines to read the AUTPCPA to permit indirect purchaser standing, since no court has affirmatively found to the contrary, and since, under the current status of the law in Alaska, only the attorney general may sue for money damages on behalf of indirect purchasers as a result of antitrust violations.

Defendants' motion for judgment on the pleadings with respect to this claim is GRANTED.

    b.  Arkansas

Plaintiffs' representative claim under Arkansas law is brought under the Arkansas Deceptive Trade Practices Act ("ADTPA"). See Ark. Code Ann. § 4-88-113. As with Alaska, defendants first argue that antitrust standing should be denied to indirect purchaser plaintiffs under ADTPA, because indirect purchaser standing would be denied to them under the Arkansas antitrust statute. Second, defendants contend that the ADTPA does not cover plaintiffs' allegations of antitrust price-fixing at any rate, since the statute only prohibits "unconscionable, false or deceptive acts or practices," none of which are alleged here.

**United States District Court**
For the Northern District of California

In support of these arguments, defendants point out that Arkansas' antitrust statute does not permit indirect purchasers to bring private actions for money damages, as plaintiffs seek to do here. This is because the antitrust statute permits only the state attorney general to bring actions for money damages. See Ark. Code Ann. § 4-75-315(b). Defendants point out further that the Arkansas legislature went so far as to reject a proposed amendment in 2001 that would have allowed private plaintiffs to bring antitrust suits for monetary damages. All of which means, according to defendants, that the legislature has expressly made clear not only that antitrust standing should be denied to indirect purchaser plaintiffs under the Arkansas antitrust statute, but that it should also be denied to indirect purchaser plaintiffs under ADTPA.

Plaintiffs, however, correctly point out that, contrary to defendants' argument, the ADTPA does not limit suits by indirect purchasers expressly to the state attorney general, as Alaska's statute does. It merely provides an affirmative right of action for the attorney general, which the attorney general "may," in his or her discretion, exercise. See Ark. Code Ann. § 4-75-315. Indeed, even defendants concede in their reply that Arkansas allows *some* indirect purchaser suits for money damages. Moreover, unlike with the court's review of Alaska's statute, here there is at least persuasive authority directly on point that provides some guidance suggesting that indirect purchaser suits alleging antitrust violations can also state claims under ADTPA.[11]

Plaintiffs specifically point to In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d 160, 178-79 (D. Me. 2004), in which the court considered the precise issue here, and stated that it "find[s] no support in the ADTPA or Arkansas case law for a ban on indirect purchaser suits. The ADTPA provides a private cause of action for damages for any person injured by a violation of the ADTPA, and is not limited to a cause

---

[11]    Plaintiffs also point to Arkansas state law authority that purportedly expressly ruled that indirect purchasers may bring antitrust claims under the ADTPA. See Pl. Opp. Br. Re Fifth Claim for Relief at 11:6-8. However, that decision has not been attached, and the court was unable to procure it from the standard electronic publishing databases. Accordingly, the court takes note of the existence of this authority, but does not rely on it.

of action for direct purchasers."  The court also noted that Arkansas "does not prohibit indirect purchaser suits under its antitrust laws."  See id.

Defendants take issue with plaintiffs' reliance on this case, particularly in light of the fact that the ADTPA does not contain language specifically prohibiting "unfair competition" – the language in the analogous federal consumer protection statute (i.e., the FTCA) that has been interpreted to cover antitrust violations.  However, defendants present no controlling legal authority supporting their claim.  They, too, rely on persuasive authority, in which other states' judicial tribunals hold that other states' consumer protections statutes that fail to address "unfair competition" do not cover antitrust claims generally or price-fixing claims.  Given, however, that In re Motor Vehicles is the only cited case that actually construes the application of actual antitrust conspiracy claims to the ADTPA specifically, the court finds it more persuasive here.  For these reasons, and in view of the fact that Arkansas' antitrust statute allows for indirect purchaser standing in certain circumstances, and the absence of state law authority holding otherwise, the court concludes that plaintiffs' claim under the ADTPA is viable, and may proceed.

Accordingly, the court DENIES defendants' motion for judgment on the pleadings with respect to this claim.

> c.    Hawaii

Plaintiffs assert a representative claim pursuant to Haw. Rev. Stat § 480-2 et seq. Both parties apparently concede that Hawaii's consumer protection statute – section 480-2(e) – allows "any person" to bring an act under the statute, and that this would apply to indirect purchasers.  They dispute, however, whether the statute – which was amended on June 28, 2002 to allow private suits by indirect purchasers alleging unfair competition – applies to plaintiffs' claim.  Defendants assert that the statute has no retroactive effect and does not cover the allegations of plaintiffs' complaint, which are based on conduct that occurred prior to adoption of the amendment in June 2002.  Plaintiffs, for their part, allege that it is the timing of the complaint's filing that counts, and that the amended statute applies, since it had already been enacted by the time plaintiffs' suit was actually filed.

44

United States District Court
For the Northern District of California

Defendants are generally correct that, under Hawaii case law, a statute has retroactive effect only if the language of the statute itself or the legislative history expressly indicate that the statute should be applied retroactively. See, e.g., Dash v. Wayne, 700 F. Supp. 1056, 1059 (D. Haw. 1988)(holding that subsection (d) of same statute does not apply retroactively). However, even if the statute applies only *prospectively* as of the June 2002 date of enactment, it still remains the case that plaintiffs' complaint was not filed until June 17, 2005, nearly three years later. Thus, the critical question is not whether the statute itself takes effect retroactively or prospectively, it is whether the statute, once enacted in June 2002, applied – and continues to apply – according to the date of alleged conduct, or according to filing date. If the statute applies with reference to the former, then defendants are correct that plaintiffs' claim, which is based on allegations of conduct that occurred prior to June 2002, does not benefit from the rule permitting indirect purchaser standing. If the statute applies with reference to the latter, by contrast, plaintiffs are correct that their claim stands, since the filing date came well after the date of the amended statute's enactment.

Turning to the language of the statutory provision at issue, the court finds that it is the date of filing that should control, and which determines whether the amended section 480-2(e) applies. Looking at the amended statute, it simply states that "[a]ny person *may bring an action* based on unfair methods of competition declared unlawful by this section." See Hi. Stat. Ann. § 480-2(e)(emphasis added). Thus, it is the bringing – or filing – of an action to which the statute applies. Defendants' arguments to the contrary, asserting that the statute applies to conduct, overreach. Furthermore, defendants provide no legal authority in support of their reading of the statute.

Accordingly, the court concludes that the amended statutory language should control, that it applies prospectively to claims filed pursuant to the statute on or after the June 2002 date of enactment, and that plaintiffs' claim under the statute is therefore proper. As such, defendants' motion for judgment on the pleadings with respect to the instant claim is DENIED.

**United States District Court**
For the Northern District of California

    d. Idaho

   Plaintiffs' complaint asserts a claim pursuant to the Idaho Consumer Protection Act ("ICPA"). <u>See</u> Idaho Code Ann. § 48-601 et seq. Defendants argue that the Idaho Supreme Court has explicitly held that indirect purchasers of price-fixed products cannot sue under Idaho's consumer protection statute – the CPA – since the statute specifically lists the types of conduct that are unlawful, and price-fixing is not one of them.

   Defendants are correct, and <u>Wasden v. Daicel Chemical Indus.</u>, 106 P.3d 428 (Idaho 2005), is dispositive. <u>Wasden</u> expressly held that allegations of antitrust price-fixing do not qualify as a type of prohibited conduct under the CPA. <u>See id</u>. at 434-45. The Idaho Supreme Court's finding in this regard was explicit: "[p]rice-fixing is not listed in § 48-603 as conduct that constitutes either an unfair method of competition or an unfair or deceptive act or practice." <u>Id</u>. at 434. In setting forth its reasoning, the <u>Wasden</u> court specifically noted that the legislative intent behind the CPA required the court to give due consideration and weight to federal interpretation of the FTCA, but held that the CPA was distinct from the FTCA in that it specifically "defines what constitutes an unfair method of competition," and excludes price-fixing from that definition. <u>See id</u>. at 433-34. <u>Wasden</u> is directly on point, and compels the conclusion here that plaintiffs' claim pursuant to the CPA, based on similar allegations of price-fixing and horizontal price restraints, must fail.

   Plaintiffs' reliance on alternative case law does persuade otherwise. The majority of the case law that plaintiffs rely on predates the <u>Wasden</u> opinion that explicitly construes the statute in question, or it constitutes only persuasive authority. <u>See, e.g., In re Western Acceptance Corp</u>., 788 P.2d 214, 216 (Idaho 1996); <u>State ex rel. Lance v. Hobby Horse Ranch Tractor and Equip. Co.</u>, 929 P.2d 741, 743 ((daho 1996); <u>In re New Motor Vehicles</u>, 350 F. Supp. 2d at 184-85; <u>DBSI Signature Place, LLC v. BL Greensboro, L.P.</u>, 2006 WL 1275394 (D. Idaho 2006). Moreover, <u>DBSI Signature Place</u>, which plaintiffs take particular note of for the proposition that it both distinguishes <u>Wasden</u> and suggests that plaintiffs' allegations are covered as a practice that is "otherwise misleading, false or deceptive" under enumerated provision 603(17) of the CPA, is off-point. To begin with, <u>DBSI</u>

United States District Court

For the Northern District of California

Signature Place did not distinguish Wasden, as plaintiffs contend, but rather *reaffirmed* its principal holding that the CPA defines the sum total of actionable conduct under it. Second, the case did not consider traditional horizontal restraint violations such as those alleged by plaintiffs here – which Wasden specifically holds *are* excluded under the CPA.

In sum, in view of Wasden, which constitutes dispositive and controlling legal authority directly on point, and in view of plaintiffs' failure to controvert Wasden, the court concludes that plaintiffs' claim pursuant to the Idaho CPA is barred. Defendants' motion for judgment on the pleadings with respect to this claim is accordingly GRANTED.

e.    Montana

Plaintiffs' claim under Montana law is brought pursuant to that state's Unfair Trade Practices Act ("MUTPA"). See Mont. Code Ann. § 30-14-101 et seq. Defendants argue that judgment on the pleadings is warranted with respect to this claim, for two reasons. First, while Montana courts have not directly addressed the indirect purchaser standing issue, the Montana Supreme Court has held that consideration should be given to federal antitrust law when interpreting similar portions of MUTPA. See, e.g., Smith v. Video Lottery Consultants, Inc., 858 P.2d 11, 13 (Mont. 1993). Accordingly, since federal law prohibits indirect purchaser standing by virtue of Illinois Brick, so should MUTPA. Second, defendants contend that only "consumers" may bring actions under the MUTPA, which the act specifically defines as "persons" who purchase or lease goods or services "primarily for personal, family, or household purposes." Since some of the plaintiffs here are business entities, they have no standing as consumers. Furthermore, standing as to the individual plaintiffs is lacking because they have not alleged any use for personal, family, or household purposes.

In response, plaintiffs first point out that MUTPA is modeled after the FTCA, which has been interpreted to allow indirect purchaser standing for antitrust violations. Plaintiffs argue that MUTPA should be interpreted the same way. Second, and in response to defendants' arguments regarding plaintiffs' standing as "consumers", plaintiffs refrain from addressing defendants' challenge to the business entity plaintiffs, but argue that the

United States District Court

For the Northern District of California

individual plaintiffs' claims should effectively be read to support the inference that plaintiffs' use was for personal, family, or household purposes, since the complaint does not allege to the contrary.

With respect to whether Illinois Brick's prohibition on indirect purchaser standing should extend to claims under MUTPA, the parties in essence agree that consideration of analogous federal law is useful in interpreting Montana law, but disagree on which federal law is analogous – the Sherman Act, which adopts Illinois Brick, or the FTCA, which plaintiffs contend permits indirect purchasers to sue. Defendants rely primarily on Smith v. Video Lottery Consultants, Inc., 858 P.2d 11 (Mont. 1993) for proof that federal interpretation of the Sherman Act controls, while plaintiffs rely primarily on In re New Motor Vehicles, 350 F. Supp. 2d at 192 for proof that FTCA interpretation controls.

Defendants' reliance on Smith is misplaced. While Smith issued from Montana's highest court and is controlling authority regarding interpretation of Montana law, that case did not construe the particular consumer protection provision of MUTPA that is at issue here. Rather, that case construed the provisions of MUTPA that specifically deal with unlawful restraints of trade. See, e.g., Mont. Code Ann. §§ 30-14-205(2)(c,g)(prohibiting horizontal restraints of trade and monopolies); Smith, 858 P.2d at 12-14 (comparing MUTPA restraint of trade provisions with sections 1 and 2 of the Sherman Act). This is why, in looking to federal law for guidance, the Smith court turned to the federal courts' interpretation of the Sherman Act; the Sherman Act is the analogous federal statute that deals specifically with unlawful restraints of trade. The consumer protection provisions of MUTPA, by contrast, prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices" in the conduct of trade or commerce, rather than unlawful restraints of trade. See Mont. Code Ann. §§ 30-14-103. These provisions are therefore not analogous to the Sherman Act, and their construction is not aided by interpretation of the Sherman Act, as suggested by the Montana Supreme Court in Smith.

Rather, MUTPA's consumer protection provisions provide that the proper source of analogous federal law is, as plaintiffs, attest, the FTCA. See id. at § 30-14-104(1)("It is the

48

United States District Court
For the Northern District of California

intent of the legislature that in construing 30-14-103 due consideration and weight shall be given to the interpretations of the federal trade commission and the federal courts relating to section 5(a)(1) of the Federal Trade Commission Act"). Accordingly, the court looks to federal interpretation of the FTCA, and not the Sherman Act, for guidance. Since there is no Montana authority directly on point construing MUTPA's consumer protection provisions specifically, and in light of the FTCA, plaintiff's reliance on In re New Motor Vehicles – which, although persuasive authority only, is directly on point – is appropriate and helpful.

In New Motor Vehicles, the court considered various plaintiffs' ability to bring a claim alleging an unlawful group boycott – a traditional antitrust claim – under MUTPA. The court held that since MUTPA is modeled after the FTCA, and since MUTPA further directs that the statute be interpreted in accordance with federal law, the real question was simply whether the antitrust violations alleged by plaintiffs had been interpreted as actionable under the FTCA. If so, then they would be actionable under MUTPA. See 350 F. Supp. 2d at 192-93. After taking stock of several federal cases interpreting the FTCA, the court concluded that Sherman Act violations, such as the section 1 violations alleged by plaintiffs there, did state claims under the FTCA, and were accordingly valid under MUTPA – even as to indirect purchasers. See id.

The court finds the reasoning of In re New Motor Vehicles instructive. For it is true that allegations of Sherman Act violations – including price-fixing such as that alleged by plaintiffs here – have been interpreted by federal authorities to state a claim under the FTCA. See Federal Trade Commission v. Cement Institute, 333 U.S. 683 (1948)(price-fixing can violate both FTCA and Sherman Antitrust Act). As such, the only question is whether indirect purchasers may bring such a claim under the FTCA and/or MUTPA, and In re New Motor Vehicles provides useful guidance in answering this question in the affirmative. Moreover, and significantly, defendants have not introduced any Montana authority establishing that indirect purchasers have no standing under Montana's antitrust provisions. As such, a finding that plaintiffs here have standing to bring their claim under MUTPA does not represent an undue expansion of existing law prohibiting indirect

United States District Court

For the Northern District of California

purchasers from suing in Montana.  Accordingly, and for the above reasons, the court concludes that plaintiffs' claim under MUTPA is viable.

Even if plaintiffs' claim is viable, however, defendants next argue that plaintiffs have no standing as "consumers" under MUTPA, since they are either business entities, or individuals who have failed to allege that they purchased DRAM for personal, family, or household purposes.  MUTPA defines a "consumer" as a "person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes."  See Mont. Code Ann. § 30-14-102(1).  "Person" is in turn defined as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity."  See id. at § 30-14-102(6).

The term "person" accordingly includes both individuals and businesses in its definition, and the provision of MUTPA that specifically authorizes individual suits incorporates this definition, as it allows all "consumers" to bring suit, without distinction as to natural persons or otherwise.  It is true, however, that plaintiffs have failed to allege that the DRAM they purchased, even as "end users," was primarily for "personal, family, our household purposes."  As such, and since MUTPA expressly contemplates this requirement for all qualifying consumers, the court GRANTS defendants' motion for judgment on the pleadings as to plaintiffs' claim under MUTPA, on the ground that the claim, as stated, is deficient.

Ordinarily, the court would grant plaintiffs leave to amend in order to cure the deficiency discussed above.  However, since the court has granted judgment on the pleadings with respect to plaintiffs' MUTPA claim on the additional grounds that the statute of limitations bars the claim and class action suits are furthermore prohibited under MUTPA, see discussion supra, any amendment here would be futile.  As such, judgment on the pleadings is granted without leave to amend.

f.    New York

Plaintiffs assert a claim under New York's General Business Law § 349.  See N.Y. Gen. Bus. Law § 349 et seq.  In challenging this claim, defendants make two arguments.

50

United States District Court
For the Northern District of California

First, that no indirect purchaser standing exists for antitrust claims under New York's consumer protection statute because, as the legislative history and New York case law illustrate, antitrust claims are simply not meant to come within the purview of New York's consumer protection statute. Second, that section 349 is limited to deceptive practices in the conduct of trade or commerce occurring in New York itself, and only covers deceptive practices personally directed at plaintiffs by defendants – which plaintiffs have not alleged.

In response, plaintiffs first contend that the court must look to the FTCA for guidance under section 349, and since the FTCA prohibits antitrust violations such as those alleged here, the statute covers plaintiffs' claim – something that several New York state courts have already recognized. Second, plaintiffs respond that, contrary to defendants' challenge under section 349 itself, plaintiffs need not allege conduct or activity within New York State, but need only allege conduct that is consumer oriented and affects the public interest in New York, which the complaint does.

Plaintiffs are correct that, as a general matter, a claim under New York's General Business Law § 349 may be predicated on allegations of antitrust violations. See, e.g., Cox v. Microsoft Corp., 778 N.Y.S.2d 147, 148 (N.Y. App. Div. 2004)(allegations that defendant entered into secret agreements with competitors to inhibit competition and artificially inflate prices for defendant's products are sufficient to state a claim under § 349); New York Jets LLC v. Cablevision Sys. Corp., 2005 WL 2649330 (S.D. N.Y. 2005)(anticompetitive conduct violating section 2 qualifies as deceptive business practice under New York consumer protection statute); New York v. Feldman, 210 F. Supp. 2d 294, 300-01 (S.D. N.Y. 2002)(collusive activity alleged under section 2 of the Sherman Act qualifies as deceptive activity under § 349). While defendants argue that contrary New York case law has held that price-fixing claims are outside the ambit of section 349, they appear to have misconstrued those cases. The claims alleged in the cited cases failed, not because they were based on anticompetitive conduct falling outside the scope of the statute, but because the conduct, as alleged, did not sufficiently set forth any materially deceptive activity or otherwise satisfy the requisite allegations under the statute. See, e.g., Paltre v. Gen.

51

United States District Court

For the Northern District of California

Motors, 810 N.Y.S.2d 496, 498 (N.Y. App. Div. 2006).

Plaintiffs have not cited, and the court has not found, a case that expressly holds that a claim under section 349 may be predicated on anticompetitive conduct alleged specifically by indirect purchasers. However, the court notes that New York's state antitrust statute, the Donnelly Act, expressly repeals Illinois Brick and allows for indirect purchaser standing. See N.Y. Gen. Bus. Law § 340(6)(the "fact that the state, or any political subdivision or public authority of the state, or any person who has sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery"). Accordingly, in view of the fact that New York courts and statutory authority support both the invocation of section 349 as a remedy for allegations of anticompetitive conduct, as well as a policy allowing indirect purchasers to bring suit, the court concludes that plaintiffs' claim here pursuant to section 349 is viable.

Even if the claim is viable, however, defendants contend that plaintiffs have failed to set forth the requisite allegations under the statute. In order to state a claim under section 349, plaintiffs must allege "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." See New York Jets, 2005 WL 2649330 at *11. Plaintiffs are therefore generally correct in stating that they need only allege deceptive activity that constitutes consumer-oriented conduct implicating the public interest in New York. See, e.g., Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y. 2d 20, 25 (N.Y. 1995). Here, however, defendants are right to point out that plaintiffs' complaint fails to do so. It nowhere mentions any conduct by defendants that is consumer-oriented and aimed at affecting the public interest in New York. Nor does it state in any concrete terms that defendants' conduct was misleading in a material way, or injured plaintiffs. Plaintiffs would have the court "reasonably infer" these facts from the allegations stating that two New York residents indirectly purchased DRAM, and were forced to pay supra-competitive prices for DRAM as a result of defendants' unlawful practices. See, e.g., Complaint at ¶¶ 13-14,47-48. This is insufficient, however. Indeed, these allegations do

United States District Court

For the Northern District of California

1   not come close to setting forth the requisite allegations for a claim under section 349.  On

2   this basis, therefore, plaintiffs' claim pursuant to section 349 is deficient.

3          As such, the court GRANTS judgment on the pleadings with respect to this claim.

4   Plaintiffs are given leave to amend their complaint, however, in order to cure the

5   deficiencies noted above, and to set forth allegations properly pleading a claim under

6   section 349.

7          g.    Oregon

8          Plaintiffs assert a claim under Oregon's Unfair Trade Practices Act ("OUTPA").  See

9   Or. Rev. Stat. § 646.605.  Defendants argue that Oregon's consumer protection statute –

10  the OUTPA – defines unlawful acts under the statute as those appearing in a specifically

11  enumerated list of practices, or as violations of other specified Oregon statutory provisions

12  – neither of which covers antitrust price-fixing.  Defendants also argue that, although one of

13  the OUTPA's enumerated provisions is a catch-all provision that states that "other unfair or

14  deceptive conduct in trade or commerce" may qualify as an unlawful practice under the act,

15  an action may only be brought under that provision if the state attorney general first

16  establishes a rule declaring the conduct alleged to be unfair or deceptive in trade or

17  commerce – something that the attorney general has not done with respect to price-fixing.

18  In response, plaintiffs acknowledge the attorney general rule requirement, but argue that

19  the catch-all provision permitting suit for "other unfair or deceptive conduct in trade or

20  commerce" is satisfied as long as plaintiffs allege a likelihood of confusion or of

21  misunderstanding, which plaintiffs have sufficiently done.

22         Neither party relies on Oregon case law that is directly on point, or dispositive of the

23  issue before the court – i.e., whether the OUTPA extends to indirect purchaser suits

24  alleging price-fixing activity.  Nor have the parties cited any persuasive authority that is

25  directly on point.  As such, the court turns directly to the language of OUTPA itself.

26         Review of the statute suggests that defendants have the better argument.  To begin

27  with, plaintiffs do not really dispute either that OUTPA specifically enumerates the type of

28  activity that can qualify as an unlawful practice, or the fact that price-fixing such as that

alleged by plaintiffs here is not one of those enumerated activities. To the extent plaintiffs do contend that their allegations nonetheless state a claim under OUTPA, since they allege conduct likely to cause "confusion or misunderstanding" or "false and misleading representations," the court finds that this is not so. None of the allegations of plaintiffs' complaint specifically allege false and misleading representations made by defendants to plaintiffs, or set forth conduct that caused plaintiffs confusion or misunderstanding, as is intended by OUTPA. While plaintiffs for the first time, at the hearing on the instant motions, identified paragraphs 68, 72, 80, 88, and 119 of the complaint as setting forth such allegations, review of these paragraphs does nothing to highlight for the court the actual nature of the conduct undertaken by defendants that constitutes false and misleading activity or activity that is likely to cause confusion or misunderstanding.

Rather, the argument before the court boils down to the narrower issue of whether plaintiffs' allegations may be covered by OUTPA's catch-all provision prohibiting a person from engaging in "any other unfair or deceptive conduct in trade or commerce." See Or. Rev. Stat. § 646.608(1)(u). And as defendants correctly note, OUTPA expressly states that no action or suit "may [] be brought under subsection (1)(u) of this section unless the Attorney General has first established a rule in accordance with the provisions of OR chapter 183 declaring the conduct to be unfair or deceptive in trade or commerce." See id. at § 646.608(4). Here, plaintiffs neither point to nor rely on any rule proscribed by the attorney general pursuant to Oregon Revised Statute chapter 183 that establishes price-fixing as an unfair or deceptive practice.

As such, and in accordance with the language of OUTPA, plaintiffs' claim pursuant to section 646.608(1)(u) fails. The court thereby GRANTS defendants' motion for judgment on the pleadings with respect to this claim.

h.    Rhode Island

Plaintiffs bring a representative claim under Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"). See R.I. Gen. Laws § 6-13.1-1 et seq. Defendants argue that, as with Montana and Oregon, Rhode Island's UTPCPA allows only

54

natural persons to sue who "purchase or lease goods primarily for personal, family or household purposes," and furthermore to sue only when they are alleging that a defendant engaged in conduct that truly creates "a likelihood of confusion" or that is otherwise unfair or deceptive, as expressed under the terms of the UTPCPA. Defendants assert that no such allegations are present here.

Defendants are correct. First, the Rhode Island Supreme Court has construed the UTPCPA to require that only natural persons are permitted to bring private rights of action under the statute, which natural persons must have "purchase[d] or lease[d] goods or services primarily for personal, family, or household purposes." See ERI Max Entertainment, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I. 1997)("plaintiff, a Rhode Island corporation doing business as a video store, plainly does not have standing to bring a private action under this statute."). Since at least four of the named plaintiffs here are business entities, they therefore do not come within the statute's definition of "person," and have no standing to sue. As for the remaining plaintiffs, there is no allegation that they purchased goods "primarily for personal, family, or household purposes." Although plaintiffs assert that the court should reasonably infer this allegation from the complaint's allegation that the plaintiffs purchased DRAM "for end use and not for resale," it is not necessarily true that just because a plaintiff has purchased DRAM for "end use," he or she has purchased DRAM for any of the above named purposes. As such, the court finds plaintiffs' claim barred as to the business entity plaintiffs, and deficient with respect to the remaining individual plaintiffs.

Second, even if plaintiffs' individual claims were not deficient for the above reason, the claim is also deficient because, as defendants argue, the complaint does not allege conduct on defendants' part that creates "a likelihood of confusion" or that is otherwise unfair or deceptive, as expressed under the terms of the UTPCPA. Preliminarily, the court does not find that plaintiffs' allegations of price-fixing and conspiracy fall within the enumerated list of conduct and activity that the UTPCPA defines as "unfair methods of competition and unfair or deceptive acts or practices." See R.I. Gen. Laws § 6-13.1-1(6).

55

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

With respect to whether plaintiffs' allegations *otherwise* illustrate conduct causing a "likelihood of confusion" or that is deceptive or fraudulent under the terms of the UTPCPA, the court finds that plaintiffs' allegations do not, for the same reasons as discussed above in connection with plaintiffs' claim under Oregon's consumer protection statute.

Accordingly, for all the above reasons, the court hereby GRANTS judgment on the pleadings with respect to this claim.  Leave to amend is granted to the individual plaintiffs, however, so that they may attempt to cure the deficiencies noted above.

    i.  Utah

Plaintiffs' claim under Utah law is brought pursuant to that state's Consumer Sales Practices Act ("CSPA").  See Utah Code Ann. § 13-11-1 et seq.  Defendants argue that the Utah CSPA prohibits only "deceptive" and "unconscionable" acts, which are expressly enumerated in the statute, and none of which include antitrust violations.  Defendants also point to the regulations issued by the Utah Division of Consumer Protection, which additionally specify the deceptive and unconscionable acts prohibited by the CSPA – again, none of which include antitrust violations.  In response, plaintiffs counter that the CSPA was meant to be interpreted in accordance with the FTCA, and therefore covers price-fixing claims such as those alleged here.

Plaintiffs are correct that one of the goals of the drafters of the CSPA was to model the FTCA.  See Utah Code Ann. § 13-11-2(4)(purpose of the CSPA is, in part, "to make state regulation of consumer sales practices not inconsistent with the policies of the Federal Trade Commission Act relating to consumer protection").  Defendants, however, are also correct that, unlike the FTCA upon which the CSPA is modeled, the CSPA does *not* include any provision directly analogous to section 5 of the FTCA, which specifically prohibits "unfair competition."  See 15 U.S.C. § 45 ("[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful").  For that reason, and since federal case law that has interpreted the FTCA to cover antitrust price-fixing allegations, has done so pursuant to section 5 of the FTCA specifically, see, e.g., FTC v. Cement Inst., 333 U.S. at 690, the

FTCA's prohibition on antitrust price-fixing should *not* be read into the CSPA here, despite the fact that the CSPA is admittedly to be construed broadly. Accordingly, and since plaintiffs have not cited to authority – controlling or otherwise – that is expressly on point on the question whether allegations of price-fixing constitute actionable conduct pursuant to the CSPA, the court refrains from unnecessarily enlarging the scope of the CSPA, and declines to hold that plaintiffs' antitrust claim, as alleged in the complaint, may be asserted under the statute.

Moreover, to the extent that plaintiffs assert that the allegations of the complaint independently set forth "deceptive" and "unconscionable" conduct, the court has been unable to determine where this is so. Plaintiffs rely upon paragraph 68 of the complaint, which sets forth allegations of active concealment on defendants' part. Plaintiffs therein allege that defendants "publicly provided pre-textual and false justifications regarding their price increases." This single statement is the strongest allegation of deception that plaintiffs' rely on, both in their papers and at the hearing on the instant matter. However, the court is of the opinion that this bare allegation is insufficient to set forth an adequate basis from which plaintiffs can assert qualifying "deceptive" and "unconscionable" conduct pursuant to the CSPA. Plaintiffs must provide more facts that demonstrate that defendants have undertaken specific and identifiable conduct, or acts of a deceptive, fraudulent and/or unconscionable nature, that have harmed plaintiffs in a fashion contemplated by the CSPA.

Accordingly, the court hereby GRANTS defendants' motion for judgment on the pleadings with respect to this claim. As noted in connection with other claims before the court, the court would ordinarily grant plaintiffs leave to amend in order to cure the deficiencies discussed above. However, since the court granted judgment on the pleadings with respect to plaintiffs' claim under the CSPA on the additional ground that the statute of limitations bars the claim, see discussion supra, any amendment here would be futile. As such, judgment on the pleadings is granted without leave to amend.

        j.      West Virginia

Defendants also target plaintiffs' claim pursuant to West Virginia's Consumer Credit

57

and Protection Statute ("WVCCP"). <u>See</u> W. Va. Code § 46A-6-101 et seq. Defendants argue that the WVCCP cannot be employed, as plaintiffs purport to do here, as an end-run around West Virginia's prohibition on indirect purchaser standing. This is so, say defendants, for two reasons. First, the WVCCP specifically enumerates the practices and conduct that constitute unfair competition or deceptive and unfair practices, and antitrust violations are not included in that enumerated list. Second, defendants contend that plaintiffs have failed to allege that they are natural persons who purchased goods for household, personal, or family purposes, as required by the WVCCP.

The WVCCP prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." <u>See id</u>. at § 46A-6-104. As defendants point out, the statute also purports to define what is meant by "[u[nfair methods of competition and unfair or deceptive acts or practices," and does so by enumerating a list of various acts and practices that the statute defines as "unfair" or "deceptive." <u>See id</u>. at § 46A-6-102(7). Neither party points to any case law that addresses this list, or otherwise establishes the meaning of unfair or deceptive practices under the statute. Nonetheless, reading the list literally, nothing on the list targets what might be called traditional antitrust conduct – e.g., price-fixing and market allocation such as that alleged by plaintiffs here, or conduct otherwise constituting a horizontal or vertical restraint on trade or commerce. Rather, the list is aimed at conduct that, in one way or another, "creates a likelihood of confusion or of misunderstanding" with respect to goods, services or businesses, or involves deceptive, false, or misleading statements and representations in connection with goods, services and businesses. <u>See id</u>. at § 46A-6-102(7)(A-P). While the WVCCP expressly states that the list of enumerated acts and practices is not meant to be exclusive, it is nonetheless clear that the statute is aimed at conduct different from the allegations of price-fixing asserted by plaintiffs here. And since the provision of the WVCCP that authorizes plaintiffs' private action expressly states that any such action may only be brought by a person or persons injured *as a result* "of the use or employment by another person *of a method, act or practice prohibited or declared to be unlawful by the provisions*

58

*of this article*," it is also clear that no such qualifying action has been asserted by plaintiffs here, there being no allegations of a method, act or practice that the court believes may be deemed "unlawful" under the statute.

It is true, as plaintiffs point out, that the WVCCP also contains a provision providing for the court's liberal construction of the statute, and setting forth a legislative declaration that the statute should be construed in accordance with similar federal statutes dealing with unfair competition and deceptive practices, and with "the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters" as the WVCCP. See W. Va. Code § 46A-6-101. However, plaintiffs have failed to set forth any legal authority that actually stands for the proposition that this provision of the WVCCP justifies allowing allegations of antitrust price-fixing brought by indirect purchasers to go forward. Similarly, while plaintiffs rely on several district court decisions – FTC v. Mylan Labs, Inc., and In re Pharm. Indus. Average Wholesale Price Litig. – as support for their point, those decisions are not helpful here. See 99 F. Supp. 2d 1, 10 (D. D.C. 1999); 233 F.R.D. 229 (D. Mass. 2006). While it is true that those courts may have ultimately allowed indirect purchaser claims to go forward under the WVCCPA, the decisions do not contain any detailed rationale for finding indirect purchaser standing under the statute, or how price-fixing allegations fall within the purview of the statute. Mylan, which provided the more in-depth discussion of the two, simply cites four different provisions of the statute, before concluding without discussion that they compelled the result therein. See 99 F. Supp. 2d at 10.

For these reasons, the court finds that the motion for judgment on the pleadings with respect to plaintiffs' claim for antitrust violations under WVCCP must be, and hereby is, GRANTED. The court does not read the WVCCP to cover the allegations of anti-trust price-fixing in question.

The court is also of the view that plaintiffs have failed to allege that they are natural persons who purchased goods for household, personal, or family purposes, as required pursuant to the WVCCP. Any amendment to cure this deficiency would prove futile,

59

United States District Court

For the Northern District of California

however, since judgment on the pleadings is nonetheless granted here on grounds that the WVCCP fails to cover plaintiffs' allegations in any event.[12]   Accordingly, no leave to amend is granted.

          k.     Wyoming

     Plaintiffs assert a claim under Wyoming's Consumer Protection Act ("CPA"). See Wyo. Stat. Ann. § 40-12-101 et seq.  Defendants argue that the CPA does not extend to price-fixing.  As with many of the other statutes under discussion herein, defendants point out that the CPA proscribes only specified conduct, none of which constitutes price-fixing. Moreover, defendants assert that no court has ever extended the CPA to antitrust claims, and that the Wyoming Supreme Court has expressly stated that the CPA's purpose is to protect against "fraudulent marketing practices" that are simply not at issue here.  In response, plaintiffs invoke the statute's broad language, and point out that no case has limited the CPA's reach.

     The court is of the view that the CPA was not intended to create a private cause of action for plaintiffs to sue for antitrust violations such as those at issue here.  While plaintiffs are correct that no controlling state authority – or even persuasive authority – has expressly excluded antitrust violations from the ambit of the CPA, the controlling authority that does exist suggests otherwise.  For as defendants point out, the Wyoming Supreme Court had occasion to pass on the CPA in Herrig v. Herrig.  See 844 P.2d 487, 495 (Wyo. 1992).  Although the court considered the CPA in the insurance context rather than the antitrust context, the court nonetheless made clear its view that the CPA "was drafted primarily to protect consumers from unscrupulous and fraudulent marketing practices." See id.  The court then declined to allow a third-party claimant action to go forward against

_____

[12]    Moreover, defendants are also correct, and plaintiffs do not dispute, that the WVCCP defines "consumer" to mean "a natural person to whom a sale or lease is made ... for a personal, family, household or agricultural purpose."  W. Va. Code § 46A-6-102(2).  And since the only provision pursuant to which plaintiffs may bring their claim is entitled, "Actions by consumers," it is correct that the instant claim can only be brought by natural persons who purchased the goods in question for a personal, family, household or agricultural purpose.

United States District Court

For the Northern District of California

a third-party liability insurer, noting that the state legislature had addressed the insurance issues between the parties when it enacted Wyoming's Insurance Code. Id.

In the court's view, the Wyoming Supreme Court would be of a similar mind set here, and if given the opportunity, would hold that plaintiffs' claim pursuant to the CPA, which is based on allegations of antitrust violations, is not cognizable under the statute. The CPA is targeted at "unscrupulous and fraudulent marketing practices" that are distinguishable from allegations of antitrust violations, and moreover, the Wyoming legislature has seen fit to provide a scheme to redress antitrust violations through enactment of a separate antitrust statute. See Wyo. Stat. Ann. § 40-4-114 et seq.

Further, plaintiffs' complaint nowhere alleges "unscrupulous and fraudulent marketing practices." Although plaintiffs have professed reliance on various paragraphs of the complaint already discussed herein, none of those paragraphs even mention defendants' marketing practices, let alone do they detail the way in which such marketing practices are fraudulent or unscrupulous. See, e.g., Complaint at ¶¶ 68, 72, 80, 88, 119.

In sum, and for all the above reasons, the court declines to permit plaintiffs' claim to go forward as pled under the CPA. The CPA does not extend to antitrust violations as alleged by plaintiffs in the first instance, and in the second, plaintiffs have failed to otherwise allege the type of "fraudulent" or "unscrupulous" marketing practices contemplated by the CPA. According, the court hereby GRANTS judgment on the pleadings with respect to this claim.

**IV.    Conclusion**

In sum, and for all the above reasons, the court holds as follows:

1.    Defendants' motion for judgment on the pleadings with respect to plaintiffs' second claim for relief under the Cartwright Act is GRANTED for lack of antitrust standing, with respect to those claims based on purchases of products in which DRAM is a component.

2.    Defendants' motion for judgment on the pleadings with respect to plaintiffs' fourth claim for relief is GRANTED for lack of antitrust standing as to plaintiffs' claims

pursuant to the laws of Arizona, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, and Wisconsin. Judgment on the pleadings on this ground is limited, as above, to those claims based on purchases of products in which DRAM is a component.

The court additionally GRANTS, for other reasons as noted, defendants' motion with respect to all plaintiffs' claims pursuant to the laws of Ohio, Alabama, South Dakota, and Pennsylvania – regardless whether those claims are based on purchases of non-component DRAM, or products in which DRAM is a component. Leave to amend is granted with respect to plaintiffs' claim under South Dakota law, but only with respect to plaintiffs whose claims are based on non-component DRAM purchases (i.e., purchases of free-standing DRAM).

The court DENIES defendants' motion for judgment on the pleadings with respect to plaintiffs' claim pursuant to West Virginia's antitrust statute.

3.      Defendants' motion for judgment on the pleadings with respect to plaintiffs' fifth claim for relief is GRANTED in part and DENIED in part. The motion is GRANTED on statute of limitations grounds with respect to plaintiffs' claims under the laws of Alaska, Idaho, Louisiana, Montana, Oregon, Utah, and Wyoming. The motion is furthermore GRANTED as to plaintiffs' claims under the statutes of Louisiana, Montana, and South Carolina, as the statutes prohibit private class action suits for money damages, but DENIED as to plaintiffs' claim under New York's consumer protection statute. Finally, the motion is GRANTED, for failure to set forth a viable claim, as to plaintiffs' claims under the statutes of Alaska, Idaho, Montana, New York, Oregon, Rhode Island, Utah, West Virginia, and Wyoming, and DENIED as to plaintiffs' claims under the statutes of Arkansas, and Hawaii. Plaintiffs are given leave to amend their claims under New York and Rhode Island law, however, in order to cure the deficiencies noted herein.

Leave to amend is permitted *only* as specified above. Amendment as to additional matters is not permitted without prior leave of court. As such, and in the event plaintiffs wish to amend their prayer for relief, based on the court's discussion herein, plaintiffs must

first seek leave of court in order to do so.

Any amended complaint shall be filed no later than **June 29, 2007**.

**IT IS SO ORDERED.**

Dated: June 1, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge